STINSON *v.* STATE.

(*Jackson,* April Term, 1944.)

Opinion filed May 6, 1944.

John F. Hall, of Jackson, for plaintiff in error.

Ernest F. Smith, Assistant Attorney-General, for the State.

Mr. Justice Chambliss delivered the opinion of the Court.

This appeal is from a conviction of second degree murder of Octavia Sellers, with a prison sentence of ten years. It is said that the evidence preponderates against the guilt of the accused, that the venue in Gibson County was not established, and that there was error in the charge. Also that the Court erred in failing to hear and act upon a plea in abatement raising the issue of venue.

The deceased, a negro girl in her twenties, was employed in July, 1937, in a cafe in Humboldt, at the time of her death. She was married, as was the accused, but they were going together and apparently having intimate relations, in disregard of marital obligations.

She was residing at the home of Jasper and Maud McCullough and was last seen alive by them on a Friday morning when she left to go to work. Her body was found the following Tuesday in some bushes just off the right of way of the railroad, a short distance southwest of Humboldt, over the Crockett County line, with knife stabs in the neck which well nigh severed the head from the body. The position and condition of the body and clothing, and the appearance of the ground and bushes, clearly indicated that she had been dragged by her feet for some distance after the killing. Several witnesses testified that blood spots or stains were visible within Gibson County. Also a piece of cloth, identified as a part of a garment she was wearing, was found nearby, also in Gibson County. A highway leading from Humboldt southwest paralleled the railroad, and leading out from this highway, was an unpaved road bearing the imprint of auto tires leading to the point near where this cloth and the blood were found. These circumstances supported the theory of the State that the deceased had been driven to this point and there murdered and from this point the body had been carried and dragged to the concealed spot where the body was discovered.

The defendant was at the time suspected and arrested, but released. It was not until some six years later that apparently further evidence was discovered and it was thereupon that the defendant was indicted and put upon trial.

These cumulative facts were proven:

(1) The deceased was last seen alive about 9:30 P. M. on Friday in Humboldt, as she was getting into a car driven by the defendant. Abe Cole, a colored man, who is not impeached, and whose good standing and veracity are testified to, and who had no apparent prejudice, or interest in the case, so testifies positively. The jury was justified in crediting his testimony. Walking by and seeing the car, Cole says, we quote:

"Q. 25. How close were you to Roy and this girl? A. Passed right by the car.

"Q. 26. Did you hear him say anything? A. I heard him say, 'if you are going get in this car,' and she said, 'I don't want to go,' and he said, 'you better get in the car,' and I walked on.

"Q. 27. Do you know where they went? A. I don't.

"Q. 28. Did you see the car leave there? A. I was going in the gate.

"Q. 29. How long after she got in before the car pulled off? A. Right on off.

"Q. 30. Did it seem like he was mad? A. He talked like a fellow that meant something, he said, 'you better get in this car.' "

(2) A ring, which the deceased owned and was seen by several witnesses to be wearing when she was last seen by them on the night before her disappearance, was some months later sold by this defendant to witness Callie Woods, who so testified and was unimpeached. It was proven that the defendant made conflicting and contradictory statements as to this ring, his possession and disposition of it.

(3) There was testimony of threats made by defendant to take the life of the deceased, if she failed to accede

to his demands that she leave her position in Humboldt, there being some basis for the inference that, moved by jealousy, he had become dissatisfied with her occupation and surroundings.

(4) Finally, and pointing most directly to his guilt, there is convincing testimony of statements made by the defendant the night after the disappearance of the deceased, which are wholly inconsistent with any theory of his innocence. Search and inquiries were being made for the missing woman. We quote from the testimony of Jasper McCullough, proven to be a reputable colored man, with whom and his wife the deceased was living in Humboldt:

"Q. 41. After Octavia disappeared did Roy Stinson come to your house? A. He certainly did.

"Q. 42. Did you have a conversation with him? A. I certainly did.

"Q. 43. Was anything said about where Octavia was? A. Yes, sir.

"Q. 44. What was said? A. He was sitting in the floor and the girls, her two sisters were there, and her brother, and we got to asking about her, inquiring about her.

"Q. 45. That was before she was found? A. Yes, sir, and the girls looked at Roy and said, 'Roy, you know something about Octavia,' and she said 'you must have done something to her,' and she said, 'I believe you have,' and I said 'Roy, where do you think she is,' and he said, 'maybe she got on a spree and went visiting,' and I kept looking at him and I said, 'Roy, you give your opinion,' and he rubbed his face and he said, 'Mr. Jasper, if I was going to look for her I would go down the highway and down the railroad and you may find her in them thickets,'

he said 'there is blackberry bushes and briars all down there.'

"Q. 46. Which way was he looking? A. Down the highway.

"Q. 47. Which way was he looking relative to where you found her? A. This way.

"Q. 48. Was that the way she was found? A. Yes, sir.

"Q. 49. After that did you get information she was found? A. Yes, sir."

Maud McCullough, wife of Jasper, testified to the same effect, as follows:

"Q. 20. After Octavia was missing, before she was found, was Roy Stinson at your house one day? A. She was missing Friday night and Roy was over there Saturday night.

"Q. 21. Were you all talking about Octavia? A. Yes.

"Q. 22. Tell the Court and jury the conversation between your husband and Roy Stinson, about where to look for her? A. We was talking about Octavia and wanting. to know where she was at, and we were all concerned about her, and Jasper asked him, Roy, to give his opinion of where she was, and Roy looked down and said, 'I tell you what I believe, I believe Octavia is dead.' His sister said 'Why you believe Octavia is dead?' He said, 'it runs in my mind she is dead.' Jasper said, 'where do you think she is at,' and he said, 'if I was going to look for Octavia I would go down the highway or the railroad and look under the briars or the willow bushes.'

"Q. 23. Which way did he look? A. He looked down toward south. He looked that way.

"Q. 24. Is that the direction where she was found? A. That is right."

There was other testimony to the same effect.

■ We need go no further. With this evidence before it, the jury was fully justified in finding the defendant guilty of this crime, despite his own testimony denying all connection with or responsibility for it. The defendant offered the testimony of several associates to establish an alibi, to the effect that they were with him on that Friday night and that he did not part with them, or have opportunity to commit the murder. The jury was the judge of the credibility of all these witnesses. We find no preponderance against the verdict.

The question of venue is raised and it is insisted that the circumstances proven do not establish that the crime was committed in Gibson County; that the body was found well over the line in Crockett County.

■ Since *Norris* v. *State*, 127 Tenn., 437, 155 S. W., 165, it has been settled in this jurisdiction that venue is not "an element of the crime charged," but "a mere jurisdictional matter," and that it may be established by a preponderance of the evidence only and not beyond a reasonable doubt.

■ ■ In the recent case of *Law* v. *Louisville & N. R. Co.*, 179 Tenn., 687, at page 696, 170 S. W. (2d), 360, 363, this Court considered fully the question of the sufficiency of circumstantial evidence, quoting from text books and decisions, and declared: "The general rule, applicable to both civil and criminal cases, is that any material fact may be established by either direct or circumstantial evidence." See 20 Am. Jur., p. 258; *Webb* v. *State*, 140 Tenn., 205, 203 S. W., 955, 15 A. L. R., 1034; Greenleaf on Ev. (15th Ed.), Sec. 13; *Watkins* v. *Prudential Ins. Co.*, 315 Pa., 497, 173 A., 644, 651, 95 A. L. R., 869. Since, as we have seen, the guilt of the accused may be proven by cir-

cumstantial evidence, it necessarily follows that this "mere jurisdictional matter" of venue may be so established. And the authorities so hold. Underhill on Criminal Ev. (4th Ed.), p. 116, and cases cited; and, to the same effect, 2 Wharton's Crim. Ev. (11th Ed.), Par. 1054.

We have hereinbefore narrated circumstances which bear on this issue. The dead body was lying in Crockett County, some 250 steps from the Gibson line. But there were convincing indications that the deadly assault had been made, or at least begun, in Gibson County. The parties plainly came from Humboldt in a car into which she was entering when last seen. It is fair to deduce that at the point on a side road where this car was stopped in Gibson County the woman was forced from the car and assailed. Nearby a fragment of the waist she wore was found. Blood was seen, and the body indicated it had been dragged from the general direction where these signs were. Here were cumulative circumstances sufficient to carry the burden of the proof on this technical question of venue. If the crime is committed in two counties, as seems likely here, the prosecution may be in either of them. Code, Section 11475.

It appears to be insisted that this issue having been raised by plea the Court should have heard this plea separately. The Assistant Attorney-General properly cites *State* v. *Landis*, 177 Tenn., 304, 145 S. W. (2d), 1032, to meet this contention. This question was for decision on the trial of the case under the plea of not guilty.

We find no error in the charge. It was made quite clear that the jury could convict only if the circumstances established the guilt of the accused beyond a reasonable doubt, excluding every other reasonable hypothesis.

■ Assignments predicated on the refusal of the Court to direct a verdict for the defendant are not well taken, both because the proof showed guilt and also because this is a matter for the jury and not for the trial judge. The practice of directing verdicts in criminal cases is without statutory authorization, is susceptible of abuse and has never been approved by this Court.

Affirmed.