# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. JESSIE JAMES AUSTIN

**Appeal from the Circuit Court for Weakley County**
**No. CR25-2000     William B. Acree, Jr., Judge**

---

### No. W2001-00120-CCA-R3-CD - January 25, 2002

---

The defendant, Jessie James Austin, appeals as of right his convictions by a Weakley County Circuit Court jury for two counts of aggravated assault, a Class C felony. The trial court sentenced him as a Range III, persistent offender to twelve years in the Department of Correction for each count to be served concurrently. The defendant contends that the evidence is insufficient to prove either count of aggravated assault and that the trial court should have instructed the jury on the lesser included offense of reckless aggravated assault. We affirm the trial court's judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

C. Michael Robbins, Memphis, Tennessee (on appeal); Harold Gunn, Humboldt, Tennessee; Joseph P. Atnip, District Public Defender; and Kevin McAlpin, Assistant Public Defender, for the appellant, Jessie James Austin.

Paul G. Summers, Attorney General and Reporter; Laura McMullen Ford, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Allen Strawbridge, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions arise from an incident in which he pointed a gun at two young brothers. Sherry Hugheley, the victims' mother, testified that in January 2000, she lived in a double-wide trailer with her two sons Paul and Zachary, who were eleven and seven years old respectively at the time of trial. She said that she and Zachary had Stickler Syndrome, a genetic disorder, and that, as a result, she had difficulty moving around and doing things for herself. She said that she had known the defendant for one and one-half years. She stated that at first, he worked for her doing yard work, cooking, cleaning, and taking her and Zachary to doctor's appointments. She said that a government agency provided her the money to pay the defendant and that she paid him monthly.

She said that it took three weeks from the time that she submitted his hours to the agency for her to receive a check, which was made out to her. She said that eventually, she began dating the defendant and that he lived with her while continuing to work for her. She said that during this time, they pooled their money for living expenses. She said that in mid-December 1999, the defendant accompanied her and Zachary on a week-long trip to Maryland to attend a study conducted by the National Institute of Health. She said that upon their return on December 13, the defendant moved out after an argument.

Ms. Hugheley testified that between 2:30 and 3:00 a.m. on January 21, 2000, the defendant came to her home wanting money. She said that at that time, she was waiting for a check from the agency and that the defendant had not worked for her since the Maryland trip. She said that she and the boys were asleep on the couch when the defendant knocked on the door. She said that she opened the door, that the defendant came inside, and that she told him that the check had not come yet. She said that the boys awoke while she and the defendant argued about her not wanting to give him fifteen dollars. She stated that the defendant entered the bedroom and that she could hear him struggling with the guns, which were in a dresser drawer. She said that she went outside to ask the man who had brought the defendant to get him out of her house. She said that she heard Paul screaming at the defendant but that she never heard the defendant threaten her children. She stated that while she was outside on the wheelchair ramp, the defendant came to the doorway and fired a gun straight ahead into a field. She said that the noise scared her because she did not realize that the defendant was behind her. She said that she was outside for only a short time.

Ms. Hugheley testified that the defendant took one of the two guns and fifteen dollars from her closet, which contained around four hundred dollars. She admitted that the defendant did not have a car, that he always had someone drive him to her house, and that he had asked for gas money to give the driver on other occasions. She acknowledged that at the time of the offenses, she owed the defendant $240 for working for her. She said that the defendant did not yell at her, threaten her with the gun, or point it at her. She said that Paul's father had told Paul that he was the man of the house and that he was to take care of everything. She said that after the children awoke, Paul tried "to stand up to [the defendant] like a man instead of a little boy, because this is what his daddy told him" to do. She said that the main reason that she separated from the defendant was that she needed some time to deal with Paul. She said that her children were taken from her and were living with their father at the time of trial because she was seeing the defendant.

Ms. Hugheley was recalled by the defendant and testified that the defendant had come to her house around 2:30 a.m. on other occasions before the day of the offenses. She said that at the time of the offenses, the defendant was still accompanying her and Zachary to the doctor's office and that she would have needed him to go with her to the doctor's office sometime after January 21.

Paul Hugheley testified that at the time of trial, he was eleven years old and lived with his father. He stated that in January of that year, he had been living with his mother and his seven-year-old brother, Zachary. He said that the defendant worked for his mother and lived with them from time to time. He said that in the early morning of January 21, 2000, he was asleep with his mother and brother on the living room couch when he was awakened by his mother and the defendant

yelling at each other. He said that the defendant was demanding money and that his mother did not have it. He said that the defendant went into his mother's room and returned with two guns and the bag in which the money was kept. He said that his mother went outside and told the man who had brought the defendant to get the defendant out of the house and that if anyone was hurt, the man would be charged too. He said that the defendant was standing two yards from the back door and that the defendant's back was toward him when he heard the defendant fire the gun. He said that he picked up the phone to call 9-1-1. He said that he had pushed the nine when the defendant, who was standing about two feet away from him, pointed the gun at him and told him to put the phone down. He said that he believed that the defendant pointed the gun at his face. He said that the defendant said, "If I can drop one, I can drop three." He agreed that he feared for his safety when the defendant pointed the gun at him and made this comment. He said that Zachary, who was on the couch beside him, told the defendant to leave them alone. He said that the defendant pointed the gun at Zachary and said, "Shut up." He testified that the defendant pointed the gun at him before firing the shot out the back door, then Zachary told the defendant to leave them alone, and the defendant said, "Shut up."

On cross-examination, Paul testified that he was in fifth grade when the offenses occurred. He said that the weekend following the incident, he told his father what had happened and that his father called the police and his lawyer. He said that he did not remember his father telling him that no black man could spank him. He said that his father told him to testify truthfully. Paul was questioned about his preliminary hearing testimony in which he said that the defendant made the comment "If I can drop one, I can drop three" to his mother while he and his brother were pretending to be asleep on the couch. Paul stated that the defendant made the comment to all three of them. He admitted that the defendant never discharged the gun in his direction.

The thirty-six-year-old defendant testified that he had known the Hugheleys for about eighteen months. He said that at first, he worked for Ms. Hugheley but that after four or five months, they began dating and he began staying at her house. He stated that at this point, they pooled their money. He said that with his paychecks, he would first pay child support for his two children and then he would give the rest of the money to Ms. Hugheley to manage. He said that he frequently accompanied the Hugheleys on trips out of town for medical treatment. He said that he did not get paid for a lot of these trips and that he made them because he loved Ms. Hugheley. He said that once they began dating, he took over the yard work in order that Ms. Hugheley could save money.

The defendant testified that he got along well with Ms. Hugheley's sons. He said that he had never threatened them and that they had written him letters saying that they loved him. He said that although he had punished the boys before, he would always tell Ms. Hugheley first. He stated that once he told Ms. Hugheley that Paul was riding his bicycle in the road and that Ms. Hugheley punished Paul for a week. He said that Paul got mad and told his father about the incident. He said that Paul told him, "My daddy said if that old n***er will whoop me, he's gonna have him locked up." The defendant stated that once the fact that he and Ms. Hugheley were dating became known, people began calling Ms. Hugheley's house and threatening to kill him and Ms. Hugheley. He said Ms. Hugheley had her telephone tapped in order to learn who was making the calls.

The defendant testified that on the day of the offenses he came to Ms. Hugheley's house at 2:30 a.m. He said that Ms. Hugheley was probably going to the doctor's office and that he was supposed to have been at her house earlier. He said that he did not realize what time it was because he had been asleep and that he asked Mr. Jamie Pankey, a handicapped man who went to his church, to take him to Ms. Hugheley's house. He said that he had gone to Ms. Hugheley's house in the early morning before due to his transportation situation and that Ms. Hugheley had paid Mr. Pankey twenty dollars for bringing the defendant to her house before. He said that when Ms. Hugheley let him inside on the morning of the offenses, he told her that he needed fifteen dollars to pay the man who had driven him there. He said that Ms. Hugheley replied that they needed that money to pay their bills that month.

The defendant testified that when they had cleaned out the trailer in which Ms. Hugheley lived, they had found an old .22 caliber pistol, which belonged to the trailer's owner, who had left town. The defendant testified that he got this gun, showed it to Mr. Pankey, and asked if he would hold it until the next morning. He said that he tried to take the bullet out of the gun but could not and that he fired it into a field to unload it. He said that Mr. Pankey replied that he did not have enough gasoline to get home. He said that he told Ms. Hugheley that he had to give Mr. Pankey some money for gasoline. He said that he and the Hugheleys had recently returned from a trip to Maryland where he had been paid thirty or forty dollars per day for seven or eight days. He said that this money was for his living expenses while in Maryland but that they had brought their own groceries in order to save the expense money for Christmas. He said that he had about $300 cash at Ms. Hugheley's house not counting the $240 that Ms. Hugheley owed him. He said that he went inside, got fifteen dollars, and paid Mr. Pankey. He said that because the children were awake and because he and Ms. Hugheley had a misunderstanding, Ms. Hugheley said that it would be best if he left. He said that although he had intended to stay for a few days, he decided not to spend the night because he and Ms. Hugheley had argued.

The defendant testified that Paul's testimony that he had pointed a gun at Paul and told Paul not to use the phone was not true. He said that he never told Paul not to call 9-1-1 or he would "drop him." He said that it would have been impossible for Paul to see him with the gun from the couch because a five-foot-tall room divider would have blocked Paul's view. He said that he did not steal anything from Ms. Hugheley. He said that he considered part of the money at Ms. Hugheley's house to be his and that when he took fifteen dollars, more money remained. He said that he left the gun.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to convict him of either count of aggravated assault. He argues that no evidence shows that he intentionally caused Paul or Zachary Hugheley to fear imminent bodily injury. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the

evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

As charged in the indictment, one commits Class C aggravated assault by intentionally or knowingly causing another reasonably to fear imminent bodily injury while using or displaying a deadly weapon. Tenn. Code Ann. § 39-13-101(a)(2), -102(a)(1)(B). A firearm is a deadly weapon. Tenn. Code Ann. § 39-11-106(a)(5)(A).

With regard to the aggravated assault of Paul Hugheley, the defendant argues that the evidence shows that he and Paul had a good relationship but that Paul was infected by his father's racial animosity. He maintains that although Paul testified that the defendant pointed a gun at him, Paul could not remember the particular part of his body at which the gun was pointed. He also notes that Ms. Hugheley testified that she heard Paul yelling at the defendant but that she did not hear the defendant say anything. He argues that these inconsistencies create reasonable doubt.

Viewing the evidence in the light most favorable to the state, Paul testified that the defendant pointed a gun at him when he attempted to call 9-1-1. He said that the defendant threatened him by saying "If I can drop one, I can drop three" and that this comment caused him to fear for his safety. This evidence is sufficient to sustain a conviction for aggravated assault. The credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The jury heard the inconsistencies and racial undertones raised by the defendant and decided to accredit Paul's account of the incident.

The defendant contends that the only evidence regarding the aggravated assault of Zachary Hugheley came from Paul's testimony. He argues that because Zachary did not testify, nothing shows that Zachary feared imminent bodily harm or that he was even aware that a gun was pointed at him. Thus, he argues that any finding that Zachary was in fear is merely speculative. The state responds that Paul's testimony provided circumstantial evidence that Zachary saw the gun and was in fear. It points to Paul's testimony that Zachary, who was on the couch next to Paul, told the defendant to leave them alone and that the defendant pointed the gun at Zachary and told him to "Shut up." It argues that this testimony reveals circumstantially Zachary's awareness of the gun and fear.

A victim's fear of imminent bodily injury may be proven with circumstantial evidence. See Stinson v. State, 181 Tenn. 172, 178, 180 S.W.2d 883, 885 (1944) (noting the general rule that either party may prove any material fact by direct or circumstantial evidence); see also State v. James Albert Adams, No. M1998-00468-CCA-R3-CD, Davidson County (Tenn. Crim. App. Dec. 15, 1999), app. denied (Tenn. Sept. 25, 2000) (inferring the victim's fear from the circumstances of the offense even though she did not testify that she was afraid); State v. Gregory Whitfield, No. 02C01-9706-CR-00226, Shelby County (Tenn. Crim. App. May 8, 1998), app. denied (Tenn. Dec. 7, 1998) (inferring fear from the victim's conduct following the assault); State v. Tommy Arwood, Jr., No. 01C01-9505-CC-00159, Bedford County (Tenn. Crim. App. May 24, 1996) (inferring the victim's fear as the result of the defendant's conduct). "The element of 'fear' is satisfied if the circumstances

of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." Gregory Whitfield, slip op. at 4 (citation omitted).

According to Paul's testimony in the present case, Zachary was with him on the couch when the defendant, who was two feet away, pointed the gun at Paul. The defendant told Paul to put down the telephone and threatened the boys by saying "If I can drop one, I can drop three." Paul testified that after this, Zachary told the defendant to leave them alone and that the defendant pointed the gun at Zachary and told him to "Shut up." From the testimony about Zachary's close proximity to Paul and the defendant, the jury could have reasonably inferred that Zachary also heard the defendant's threat, which was directed to all three Hugheleys. Zachary responded by asking the defendant to leave them alone, which reveals that he was aware of the defendant's actions and also suggests that he was in fear. Finally, the jury could have inferred that Zachary reasonably feared imminent bodily injury when the defendant turned the gun on Zachary after threatening that he could easily "drop" the three Hugheleys. We hold that the evidence is sufficient to show that the defendant's actions caused Zachary reasonably to fear imminent bodily injury.

Finally, the defendant summarily contends that the evidence did not show that he intentionally or knowingly assaulted either victim. Without further explanation, he states that the trial court's grant of his motion for a judgment of acquittal for the aggravated assault of Ms. Hugheley and the jury's acquittal on the theft charge provide additional evidence of the lack of an intentional or knowing mental state.[1] One "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). One "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). In State v. Wilson, 924 S.W.2d 648, 651 (Tenn. 1996), our supreme court discussed the sufficiency of the proof of the mens rea element with regard to aggravated assault convictions stemming from a drive-by shooting:

> The aggravated assault statute under which the state seeks conviction of defendant requires that the state prove either that defendant shot into the [victims'] home (a) for the purpose of causing the victims to fear imminent bodily injury (intentionally) or that the defendant was (b) aware that the shooting would cause the victims to fear imminent bodily injury (knowingly).

The court affirmed the reversal of the convictions because the record contained no proof that the defendant knew that anyone was in the house at the time of the shooting. Id.

---

[1]With regard to this assertion, we note that at the close of the state's proof, the trial court granted the defendant's motion for a judgment of acquittal for the aggravated assault of Ms. Hugheley. It also granted the motion with regard to the aggravated robbery count but determined that it would charge the lesser included offense of theft for that count. It denied the motion as to the two counts of aggravated assault relating to Paul and Zachary Hugheley. The jury acquitted the defendant of theft.

In the present case, we believe that the jury reasonably concluded that the defendant intentionally or knowingly displayed his gun in order to place Paul and Zachary Hugheley in fear of imminent bodily injury. The defendant acted intentionally if he pointed the gun at the victims for the purpose of causing them to fear imminent bodily injury. He acted knowingly if he was aware that his pointing the gun at the victims would cause such a fear. In the light most favorable to the state, the evidence reveals that defendant threatened the young brothers by saying "If I can drop one, I can drop three." This threat reveals that the defendant intended to cause the victims to fear imminent bodily injury. The proof also reveals that Paul picked up the telephone in an attempt to summon help and that Zachary asked the defendant to leave them alone. The evidence that the defendant subsequently pointed his gun at the victims and told them to put down the telephone and to "Shut up" respectively reveals that his conscious objective or desire was to cause the victims fear in order that they would comply with his orders. Thus, the defendant acted intentionally. The evidence is sufficient to convict the defendant of the aggravated assault of both victims.

## II. LESSER INCLUDED OFFENSE

As an afterthought to his sufficiency argument, the defendant contends that the trial court should have instructed the jury on the lesser included offense of reckless aggravated assault, a Class D felony. The state contends that the defendant failed to raise this issue in his motion for a new trial and that it does not constitute plain error. It argues that reckless aggravated assault is not a lesser included offense of intentional or knowing aggravated assault by means of displaying a deadly weapon because the former contains an additional element – that of physical injury – aside from the differing mental state. It also contends that the record would not have supported an instruction on reckless aggravated assault because no evidence of physical injury existed.

We begin by noting that a defendant seeking to challenge the jury instructions given at trial must raise the issue in his motion for new trial or it will be waived. T.R.A.P. 3(e). On the other hand, the defendant's right to a trial by jury under article I, section 6 of the Tennessee Constitution "is violated when the jury is not permitted to consider all offenses supported by the evidence." State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). The trial court has a duty to instruct the jury on all lesser included offenses if sufficient evidence exists to support a conviction for the lesser offense even if the defendant fails to request the instruction. Id. at 718; State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). When the failure to instruct the jury on an appropriate lesser included offense affects the substantial rights of the defendant, we may reverse the conviction on the basis of plain error. See Tenn. R. Crim. P. 52(b). In this respect, five factors determine whether an issue merits plain error status:

1. The record must clearly establish what happened in the trial court;
2. a clear and unequivocal rule of law must have been breached;
3. a substantial right of the accused must have been adversely affected;
4. the accused did not waive the issue for tactical reasons; and
5. consideration of the error is necessary to do substantial justice.

State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994).

The problem for the defendant in the present case, though, is that the record lacks sufficient evidence to justify an instruction on reckless aggravated assault. Such an assault is defined as recklessly assaulting another by intentionally, knowingly, or recklessly causing bodily injury that is either serious bodily injury or committed while the defendant used or displayed a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(2)(A)-(B). Bodily injury is defined as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(2). Viewing the evidence in the light most favorable to the existence of reckless aggravated assault, the record is devoid of any evidence of bodily injury to either Paul or Zachary Hugheley. Thus, much less plain error, the trial court did not commit any error by not instructing the jury regarding reckless aggravated assault.

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE