IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 11, 2004

**STATE OF TENNESSEE v. ANDREW NEAL DAVIS**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-391     Cheryl Blackburn, Judge**

------

**No. M2002-02375-CCA-R3-CD - Filed July 9, 2004**

------

Defendant, Andrew Neal Davis, was indicted on one count of first degree premeditated murder, one count of first degree felony murder, and one count of aggravated child abuse of a child under the age of eighteen. Defendant's first jury trial ended in a mistrial. On the first day of the second trial, the trial court granted the State's motion, over Defendant's objection, to amend count three of the indictment, aggravated child abuse, to substitute the words "under six years of age" for "under eighteen years of age." At the conclusion of his second jury trial, Defendant was convicted of one count of first degree felony murder and one count of aggravated child abuse of a child under the age of six. Prior to the jury's verdict, the State entered a nolle prosequi as to count one of the indictment, first degree premeditated murder. The trial court sentenced Defendant to life imprisonment with the possibility of parole for the felony murder conviction. Following a sentencing hearing, the trial court sentenced Defendant to twenty-two years imprisonment for the aggravated child abuse conviction as a Range I offender and ordered the sentence for aggravated child abuse to run concurrently with Defendant's life sentence. Defendant does not appeal his sentence for aggravated child abuse. Defendant appeals his convictions alleging (1) that the evidence is insufficient to support Defendant's convictions for first degree felony murder and aggravated child abuse beyond a reasonable doubt; (2) that the trial court erred in allowing the State to introduce autopsy photographs of the victim; (3) that the trial court erred in permitting the State's expert witness, Dr. Ellen Clayton, to offer opinions outside her area of expertise; (4) that the trial court erred in allowing Dr. Bruce Levy to testify as a rebuttal witness; (5) that the State's improper cross-examination of Dr. Charles Harlan at Defendant's first trial which led to Dr. Harlan's refusal to testify at Defendant's second trial resulted in a denial of Defendant's due process rights; and (6) that the trial court erred in allowing count two of the indictment, aggravated child abuse, to be amended on the day of trial to reflect that the victim was under the age of six. After a thorough review of the record and the arguments and briefs of counsel, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered an opinion of the court. DAVID G. HAYES, J., filed an opinion concurring in part and dissenting in part. JOHN EVERETT WILLIAMS, J., filed a separate concurring opinion.

Jodie A. Bell, Nashville, Tennessee, (on appeal); and Ed Yarbrough, Nashville, Tennessee, (at trial), for the appellant, Andrew Neal Davis.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Bernard McEvoy, Assistant District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

Jennifer Chilton Blankenship and her eight-month-old son, (the victim) Caine McPeak, resided at Stewart's Ferry Apartments where Ms. Blankenship worked as a leasing agent. She and Defendant had been dating since September, 1999, and were engaged to be married. Defendant sometimes spent the night at her apartment, and he stayed over Thursday night, January 27, 2000. Ms. Blankenship testified that she was not scheduled to work on Friday. That morning, she and Defendant went to the grocery store while the victim stayed with her mother, Vickie Chilton. After they picked up the victim, Ms. Blankenship and Defendant drove back to Ms. Blankenship's apartment. Defendant was dressed in a tee-shirt, blue jeans, and heavy socks because it was cold. Ms. Blankenship took a shower while Defendant tried to feed the victim, but the baby would not eat. When Ms. Blankenship checked on them she said that Defendant appeared frustrated, and he scooted the victim across the floor toward her with his hand. Ms. Blankenship told Defendant that he needed to be more careful with the baby.

Ms. Blankenship thought the victim was fussy because he was tired, and she put the baby down for a nap. She left the victim crying in his crib and went to take a shower. Defendant began to clean out the refrigerator so that he could put the groceries away.

Ms. Blankenship said that she left the apartment around 2:20 p.m. to pick up her paycheck, leaving the victim in Defendant's care. She had planned to deposit her paycheck in the bank by 2:30 p.m. but was running late. Ms. Blankenship closed the front door behind her without locking it. When she arrived at the office, Ms. Blankenship had to wait twenty to thirty minutes before she could receive her check because the office manager was at lunch. Ms. Blankenship then drove to her mother's house. Ms. Chilton operated a day care out of her home, and she left Ms. Blankenship in charge of the children while she went to the bank to conduct some personal business and deposit Ms. Blankenship's check.

While she waited for her mother to return, Ms. Blankenship called Defendant to see if the victim had fallen asleep. Defendant answered the telephone before it rang suggesting that they had been calling each other at the same time. Defendant told Ms. Blankenship that he had just checked on the victim because he had stopped crying, and that the victim would not respond to him when Defendant called out his name or touched the baby. Defendant did not tell her that the victim was having trouble breathing. Ms. Blankenship called her friend, Shannon Monticello, who was working that day at the apartment complex. Ms. Blankenship asked Ms. Monticello to check on the victim

because Ms. Blankenship could not leave her mother's house until Ms. Chilton returned. Ms. Blankenship called Defendant to tell him that Ms. Monticello was on the way, and he told her that the victim was still not responding to his touches or words. Ms. Blankenship asked Defendant to hold the victim up to the telephone, and she heard the victim gasping for breath.

When Ms. Blankenship arrived at the apartment, the paramedics were performing CPR on the victim. Defendant was wearing only shorts at this time despite the cold weather. When she and Defendant left the apartment to follow the ambulance to Summit Medical Hospital, Ms. Blankenship noticed that the groceries were still on the kitchen floor. Defendant did not tell Ms. Blankenship that the victim had been bleeding from the mouth while she was gone. On the way to the hospital, Defendant grew angry and struck his fists against the steering wheel. When Ms. Blankenship looked at him, Defendant acted like nothing had happened.

Later that afternoon, while Ms. Blankenship stayed at the hospital, Defendant accompanied the police back to Ms. Blankenship's apartment. Defendant telephoned her twice from the apartment. The first time he merely asked what was going on without inquiring about the victim. During the second phone call, Defendant told Ms. Blankenship that in case the police questioned her, the victim had been bleeding that afternoon, that he had cleaned the victim's face, and that he threw the baby's shirt and washcloth into the trash because it was blood-stained. Ms. Blankenship said that Defendant relayed that information nonchalantly.

After the victim died, Ms. Blankenship returned to her apartment to retrieve some clothes for her son's funeral. She also searched for the blue jeans and tee shirt that Defendant wore prior to the incident but did not find them.

At the request of the police, Ms. Blankenship taped Defendant's telephone calls to her because she wanted answers to her questions. During the first telephone call, Defendant told Ms. Blankenship that a friend of his had found some information about head injuries on the internet and reminded her that she had said the victim was different when he returned from visiting his father, Aaron McPeak. Defendant admitted that he removed the trash bag containing the victim's shirt and the washrag he used to wipe the blood from the victim's mouth because he was scared. Defendant denied that he told the police that the washrag was "dripping with blood." In a subsequent call, Defendant told Ms. Blankenship that his friend's internet research indicated that the victim could have sustained a blood clot on his brain two to three weeks before any symptoms appeared.

On February 26, 2000, Defendant explained in another taped telephone conversation that he first noticed the blood in the victim's mouth after his first telephone conversation with Ms. Blankenship. Defendant told Ms. Blankenship that he ran to the bathroom to get a wet washcloth and cleaned out the victim's mouth. Because the baby also had blood on his shirt, Defendant said that he changed the victim's tee shirt. Defendant said that when he ran to let Ms. Monticello in, he dropped the washcloth and shirt in the trash can in the kitchen on his way to the front door. Defendant remembered that he took the trash bag with him as he left the house to go to the hospital and placed the bag outside the apartment door. Defendant told Ms. Blankenship that she was already

downstairs by the car when he left the apartment. Ms. Blankenship disagreed with Defendant's version and reminded him that they left the apartment together. Ms. Blankenship asked Defendant why he was so concerned about the trash when they were taking the victim to the hospital, and Defendant said that he was in shock and not thinking clearly.

Ms. Blankenship said that she usually picked the victim up and held him when he cried. Defendant told her that the victim would become a "mama's boy" if she did that. Ms. Blankenship said that Defendant would become angry and frustrated when the victim cried.

Ms. Blankenship was aware that Defendant had a back problem. She said that Defendant's counsel had set up two appointments for Defendant to see a physician but that Defendant did not keep either appointment. During their relationship, Ms. Blankenship said that Defendant played basketball once a week or once every two weeks. He also worked out at their church's gymnasium. That winter, Defendant helped his father carry a truck load of firewood to Ms. Blankenship's second-floor apartment. Defendant did not complain about his back during this chore.

On cross-examination, Ms. Blankenship agreed that she initially told the police on two different occasions that she left the apartment to pick up her paycheck around 3:00 p.m.

At the time of the incident, Shannon Monticello worked with Ms. Blankenship at Stewart's Ferry Apartments. Friday, January 28, 2000, was her last day of work. When Ms. Monticello returned from the bank around 2:30 p.m., Ms. Blankenship had arrived at the office to pick up her paycheck. They chatted a few minutes, and then Ms. Blankenship left when Ms. Monticello clocked in at 2:52 p.m. Twenty to twenty-five minutes later, Ms. Blankenship called Ms. Monticello and told her that Defendant was having trouble getting the victim to respond to him. Ms. Blankenship asked Ms. Monticello to go over to the apartment and check on the victim. Ms. Monticello said that Ms. Blankenship was anxious at that point, but not frantic.

Ms. Monticello said that she arrived at the apartment in about two minutes. The front door was open, and Ms. Monticello noticed a white trash bag beside the front door. Ms. Monticello remembered this detail because Ms. Blankenship kept her apartment "really clean," and leasing consultants were not supposed to leave garbage in the hallway. Ms. Monticello walked back to the victim's bedroom and met Defendant in the hallway. Defendant was only wearing shorts.

Ms. Monticello lowered the crib railing and picked the victim up. Ms. Monticello said the baby was limp and gasping for air. The victim could not hold his head up. Ms. Monticello did not notice any blood on either the baby or the crib. Ms. Monticello told Defendant to call 911. When he got a busy signal, Defendant slammed the telephone against the wall and knocked the battery out. Ms. Monticello fixed the telephone and dialed 911. When the second call began to ring through, she handed the telephone to Defendant. Defendant told the dispatcher that he had put the victim in his crib for his nap, and when he looked in on him a few minutes later the baby was limp and unresponsive. Defendant handed the telephone to Ms. Monticello when the 911 dispatcher began to explain how to do CPR. Ms. Monticello followed the operator's instructions and performed CPR

on the baby until the paramedics arrived. Ms. Monticello did not notice the mark over the victim's eye or any injury inside of the baby's mouth. Ms. Blankenship arrived at the apartment about two minutes after the paramedics. On cross-examination, Ms. Monticello agreed that she initially told the police that she returned to the leasing office at 2:45 rather than 2:30.

Gail Tweedy, an EMT dispatcher for the Metro Nashville fire department, confirmed that Defendant's 911 call was initially received at 3:31 p.m.

Meg Economy, Ms. Blankenship's co-worker, testified that Ms. Blankenship stopped by the office to pick up her paycheck around 2:30 or 2:45 and that they talked about 20 to 30 minutes before Ms. Monticello arrived. Ms. Economy went to Vanderbilt Hospital after work. She described Defendant as angry and upset. At one point, Defendant slammed his hands on a table.

Donald Davenport, the manager of the apartment complex, said that he received a telephone call around 2:30 p.m. concerning Ms. Blankenship's paycheck. He authorized the maintenance employee to unlock his office so Ms. Blankenship could get her check. When Mr. Davenport returned to the office at 3:00 p.m., Ms. Monticello had gone to Ms. Blankenship's apartment. A few minutes later, Mr. Davenport went to Ms. Blankenship's apartment "to get his employee back" because he thought Ms. Monticello had been gone long enough. He and Ms. Blankenship arrived at the apartment at the same time. Mr. Davenport also remembered seeing a white trash bag beside Ms. Blankenship's front door because that was not allowed.

Mr. Davenport said that Ms. Blankenship's apartment was carpeted, and the carpet's pile was approximately three-fourths to one inch high. A pad was between the carpet and the concrete subfloor.

Vickie Chilton, the victim's grandmother, testified that the victim was a very healthy baby. She said that Ms. Blankenship and Aaron McPeak, the victim's father, had never married, but the victim spent one night each weekend with his paternal grandparents. Ms. Blankenship began dating Defendant in September 1999. Ms. Chilton said that Ms. Blankenship and Defendant returned from the grocery store to pick up the victim between 12:00 and 12:30 p.m. Ms. Chilton said that Defendant did not change his explanation of how the victim was injured even after the family was informed that the victim had a skull fracture.

Dr. Roland Gray, the victim's primary physician, said that the victim exhibited the normal developmental characteristics of an eight-month-old baby. He last saw the victim on December 28, 1999 when he treated the baby for a mild ear infection. On cross-examination, Dr. Gray said that he had never had any reason to suspect that the victim was abused.

Dr. Bryan Sharpe was the physician who treated the victim at Summit Medical Hospital. When the baby arrived, he was in full respiratory arrest. The paramedics had inserted a tube into the victim's windpipe on the way to the hospital. Dr. Sharpe did not recall anyone yanking on the baby's upper lip and did not notice the victim's torn frenulum which is the membrane that attaches the

upper lip to the gum. Dr. Sharpe said that only a minimum amount of pressure was needed to open an unresponsive patient's mouth. Initially, Dr. Sharpe believed that the victim had an infection so he administered antibiotics to the baby. Family members told Dr. Sharpe that the victim was put in the crib for his nap and then developed breathing difficulties.

After further examination, Dr. Sharpe felt some swelling at the back of the victim's head in the parieto-occipital region. An x-ray revealed a large fracture beneath the swollen area, and Dr. Sharpe confirmed retinal hemorrhaging. Because of the urgency surrounding the victim's medical treatment, Dr. Sharpe only ordered a single x-ray of the swollen area of the victim's head rather than a complete skull series. The purpose of the x-ray was merely to confirm Dr. Sharpe's suspicions of a fracture and assist in determining how to treat the victim. The victim was then flown by helicopter to the Vanderbilt pediatric intensive care unit because Summit Medical Hospital was not equipped to handle a critically injured child. Dr. Sharpe told the family members that the victim had suffered a skull fracture. One of the family members asked if the fracture could have occurred if the victim hit his head on the crib's railing. Dr. Sharpe told them that the victim's injury was very serious and caused by a stronger force than bumping his head. Dr. Sharpe asked if the victim had been dropped or if he had struck his head on any object, but no one offered any information.

On cross-examination, Dr. Sharpe agreed that babies incur skull fractures more readily than adults and conceded that retinal hemorrhaging could worsen over time. Dr. Sharpe explained that the x-ray was a single view of the victim's skull. Because a CAT scan is three-dimensional, it is able to reveal the presence of multiple fractures, the depth of the fractures and whether the fractures have pushed bone against the brain. Dr. Sharpe did not perform a CAT scan on the victim.

Dr. Ellen Clayton was the victim's treating physician at Vanderbilt Hospital. Dr. Clayton testified that she is a board certified pediatrician and has been a general pediatrician with Vanderbilt Hospital since 1988. She also serves on Vanderbilt's faculty as a professor of pediatrics. Dr. Clayton is a member of a specialized team at Vanderbilt Hospital that examines children admitted to the hospital with injuries that are suspected to have been caused by abuse or neglect. The team examines the child, gathers data and issues a report reflecting their collective judgment about whether or not the case is one of abuse or neglect. The team meets on a routine basis to discuss the previous weeks' cases. Dr. Clayton estimated that she had personally evaluated at least a hundred children who were suspected victims of abuse or neglect and participated in the review of hundreds of other cases. Based on this experience, the trial court qualified Dr. Clayton as an expert in pediatrics and child abuse. Dr. Clayton, however, said that she is not a board certified forensic pathologist.

Dr. Clayton first saw the victim at about 7:00 p.m. She could not perform a full physical examination of the victim at this time because the baby was critically ill. Dr. Clayton, however, observed that the victim had some bruising on his forehead, a large bruise over the left side of the back of his head, and massive retinal hemorrhaging. Dr. Clayton ascertained from a CAT scan that the victim had suffered a major head injury. A Glassco coma scale that measures the patient's level of alertness was administered, and the victim's level of responsiveness was at the bottom of the

scale. Dr. Clayton said that the victim would have exhibited the symptoms associated with head trauma, such as limpness and lack of responsiveness, immediately after the incident, and the symptoms would have been clearly visible to the caregiver.

Ms. Blankenship told Dr. Clayton that Defendant called her while she was at her mother's house and told her that the victim was suddenly unresponsive. Ms. Blankenship said that she did not know if the victim had suffered any trauma while she was gone that could have caused his injuries. Dr. Clayton did not have the opportunity to speak with Defendant. However, she testified that the victim's injuries were not consistent with a fall on to a carpeted surface.

Dr. Clayton said that she did not see the torn frenulum because the endotracheal tube prevented an examination of the victim's mouth. Dr. Clayton, however, said that this type of laceration would have bled excessively, and an injury to the frenulum is generally inflicted rather than accidental.

Dr. Clayton said that the victim incurred three separate complex fractures that were not symptomatic of a short fall. The subdural and subarachnoid hemorrhages indicated that the victim suffered a rotational, rather than a transactional, injury. Dr. Clayton said that bilateral retinal bleeding is almost never present in any cases other than child abuse cases. Dr. Clayton indicated that the medical treatment administered to the victim would not have aggravated the fractures.

On cross-examination, Dr. Clayton said that she spent less than an hour examining the victim. Dr. Clayton admitted that she did not have any information concerning the victim's transport to the hospital or how many people had attempted to insert an endotracheal tube. Dr. Clayton conceded that it is possible the frenulum laceration occurred during treatment.

Dr. John Gerber conducted the autopsy. The autopsy revealed that the victim's death was caused by a blunt force injury to the head, and Dr. Gerber determined that the manner of death was homicide. An external examination revealed that the victim had an abrasion on the right side of his head, two contusions on his forehead, and a laceration of the frenulum in his mouth. An internal examination revealed two occipital skull fractures and one parietal skull fracture. The three fractures were not interconnected or interrelated. The examination also revealed cerebral edema, a subgaleal hemorrhage, a subdural hemorrhage, a subarachnoid hemorrhage, and retinal hemorrhaging in both eyes. The frenulum tear occurred a few hours before the victim's death and would have bled significantly. Dr. Gerber said that this type of injury in a non-ambulatory child is generally inflicted by the caregiver. The three forms of cerebral bleeding along with the retinal bleeding indicated that a combination of both rotational and translational injuries were inflicted. Dr. Gerber explained that a direct blow to the head represents a translational injury. With a rotational injury, the head moves back and forth in an arc as it would if someone picked a child up by the legs and swung the child into an object.

The three skull fractures were complex rather than linear fractures. Linear fractures occur most frequently in accidental falls. Dr. Gerber testified that it would take more force to produce a

complex fracture than a linear fracture. The lack of interrelation between the three fractures suggested at least two, and maybe three, separate blows. The position of the three fractures indicated that the victim received a direct blow to the side of the head and also struck the back of his head on a hard surface. The victim would have lost consciousness and experienced breathing difficulties immediately following the infliction of the injuries. Dr. Gerber said that he would not expect to see the types of injuries suffered by the victim on a child who was dropped from a height of six feet to a carpeted surface. If the victim had been dropped and struck his head on a hard object before hitting the floor, the victim would have incurred one linear fracture. Furthermore, because a baby's head is the heaviest part of the body, Dr. Gerber said that if the victim fell over Defendant's shoulder he would expect to see the first point of impact on the top of the victim's head, not the back of his head. In Dr. Gerber's opinion, the victim's injuries were inconsistent with Defendant's explanation that he accidently dropped the victim on to the carpet.

On cross-examination, Dr. Gerber acknowledged that some medical authorities have concluded that falls of even short distances can cause lethal injuries. Dr. Gerber said that he did not know how the injuries were incurred when he did the autopsy although he believed that a police officer informed him on January 29 that the child was dropped. Dr. Gerber said that he did not review the x-ray taken at Summit Medical Hospital at the time of the autopsy. When shown the x-ray at trial, Dr. Gerber agreed that the x-ray showed only a single linear parietal fracture. Dr. Gerber said, however, on redirect examination that the CAT scan also showed only the parietal fracture and explained that an autopsy is the better mechanism for seeing the three fractures. Dr. Gerber said that routine medical treatment following a skull fracture would not have aggravated the existing fracture or produced a new fracture. Although Dr. Gerber conceded on cross-examination that retinal hemorrhaging can occur during the administration of CPR, he said that the bleeding would have been more generalized than the bleeding experienced by the victim. Dr. Gerber also conceded that the lip injury could have possibly occurred during resuscitation.

Jeff Goodwin, a detective with the Metro Nashville Police Department, testified that he received a call around 4:30 p.m. that Summit Medical Hospital had reported the treatment of an infant with head trauma. When Detective Goodwin reached the hospital, the victim had already been transported to Vanderbilt Hospital. Detective Goodwin asked the family members to choose someone to accompany him to Ms. Blankenship's apartment, and Defendant was selected. Detective Goodwin spoke with Defendant before they left the hospital, and Defendant appeared unemotional. Their conversation was casual.

As Defendant showed Detective Goodwin around the apartment, he said that he and Ms. Blankenship had returned to the apartment around 2:30 p.m. Defendant tried to feed the victim while Ms. Blankenship took a shower, but the baby was fussy and was eventually put in his crib for a nap. Defendant said that Ms. Blankenship left the apartment around 2:45 p.m. Defendant checked on the victim a few minutes later and found the baby limp and unresponsive. Defendant did not offer any explanation for the victim's breathing difficulties and did not mention the bleeding or changing the victim's clothes. Defendant told Detective Goodwin that the victim had only been left alone twice that day. One time occurred when the victim crawled into the playroom at his grandmother's

house, and the second time was when Defendant was in the kitchen preparing the victim's food while the victim was in the living room with his toys. Defendant said that the victim fell down frequently.

As he walked through the apartment, Detective Goodwin noticed that the lid to the trash can was lying on the kitchen floor. Defendant said that he had taken the trash to the dumpster. At some point, Defendant left the apartment for a short time. When he returned, Detective Goodwin again asked about the trash. Detective Goodwin examined the landing in front of the apartment and found two white trash bags beside the door of an apartment across the breezeway. In one of the bags, Detective Goodwin discovered a medicine bottle with the victim's name on the label, a wet wash cloth, and a wet infant's shirt. Defendant later told Detective Goodwin that he moved the trash bags across the breeze way because he realized that the trash contained items that he did not want to show to the police.

Defendant was interviewed by the police again at Vanderbilt Hospital. During this interview, Defendant said that he noticed blood in the victim's mouth after he spoke with Ms. Blankenship the first time. He used the washcloth to wash the blood out of the victim's mouth and then changed the baby's shirt because it was stained with blood. Defendant said that he threw the cloth and shirt in the trash when he went to open the door for Ms. Monticello. Defendant said that the victim was all right when Ms. Blankenship left the apartment and insisted that no one else had been in the apartment while she was gone. Detective Goodwin asked Defendant if he had dropped the baby, and Defendant said no.

Defendant then testified that he strained his back while he was working at United Parcel Services. He underwent physical therapy for six or seven months, but the effects of the injury continued. At the time of the incident, he had just been laid off from Lifeway Christian Resources. Defendant admitted that his back was not hurting when he carried the groceries up the stairs to Ms. Blankenship's apartment on the day of the incident.

Defendant said that he and Ms. Blankenship returned to the apartment that afternoon between 2:15 and 2:30 p.m. Ms. Blankenship put the victim in his crib and left the apartment around 2:45 or 3:00 p.m. Before she left, Defendant said that Ms. Blankenship turned up the volume of the television so that he would not have to listen to the victim cry. Defendant said that he put on a pair of shorts partly because he had spilled baby food on his jeans but mainly because he just wanted to change clothes.

Defendant went into the victim's room a few minutes after Ms. Blankenship left. Defendant said that the victim was awake so Defendant decided to take the baby back into the living room. Defendant propped the victim up against his shoulder and held him around his calves. Defendant reached back into the crib for the victim's pacifier and blanket. When he stood up, a sharp pain shot through his back, he let go of the victim's legs, and the victim fell over Defendant's shoulder on to the floor. Defendant did not see or hear what the victim's body struck during the fall. When he turned around, the victim was lying on his back near the rocking chair and footstool. Defendant said that he could not get a response out of the baby and laid the victim back in his crib. At this point,

Defendant only thought that the wind had been knocked out of the victim. He went to telephone Ms. Blankenship. When he returned to the victim's bedroom, he saw blood between the baby's lips. He removed the baby from the crib, washed his mouth, and changed his shirt. Defendant said that the victim was limp during this time.

Defendant said that he was scared and embarrassed to tell Ms. Blankenship and her family that he had dropped the victim. As time passed, it became harder to admit the truth of what happened that day. Defendant said that Ms. Blankenship taught him how to care for the baby, and Defendant said that he loved the victim.

On cross-examination, Defendant said that he checked on the victim about five minutes after Ms. Blankenship left. He said that his back spasm lasted only a few minutes and did not happen again when he bent down to pick up the victim after he fell to the floor. Defendant conceded that the only exposed surface that the victim's head could have struck was the wooden arm of the rocking chair. He agreed that the chair arm was approximately twenty inches above the floor. Although the photographs of the victim's room show that his pacifier was in the middle of the crib in plain view, Defendant insisted that he did not see the pacifier when he picked the victim up the first time.

Renelle Davis, Defendant's mother, said that Defendant's back "would go out" periodically, and the muscle spasms would last between thirty seconds to a minute. Defendant's father, Eddie Davis, said that he and Defendant had not carried firewood up to Ms. Blankenship's apartment on January 27. On cross-examination, Mr. Davis admitted that he did not observe his son suffering from any back pain on the day of the incident, and Defendant did not complain about any pain. Mr. Davis said that he did not learn that Defendant had dropped the victim until a month or six weeks after the incident.

Dr. Bruce Levy, the Chief Medical Examiner for Davidson County, testified as a rebuttal witness. Dr. Levy said that he reviewed Dr. Gerber's autopsy report and agreed with his conclusion that the victim suffered from three separate complex skull fractures. Dr. Levy said that the victim's injuries, other than the abrasion above his eye, were not consistent with Defendant's testimony that he dropped the baby. Dr. Levy testified that the victim would not have incurred complex fractures from a fall onto a carpeted surface, and in Dr. Levy's opinion, the injuries were intentionally inflicted upon the baby.

Based on this evidence, the jury found Defendant guilty of one charge of first degree felony murder and one charge of aggravated child abuse.

## I. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support his convictions of first degree felony murder and aggravated child abuse beyond a reasonable doubt. Defendant submits that the State failed to prove that he knowingly injured the victim. Although Defendant concedes that in a light most favorable to the State, the evidence showed that the victim suffered fatal injuries while

in Defendant's care, the State's medical experts only suggested what might have happened. Defendant contends that this circumstantial evidence was insufficient to establish that the injuries were knowingly inflicted.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

In order to sustain Defendant's conviction for felony murder, the State was required to prove that Defendant killed the victim in the perpetration of aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2). In other words, the killing must be done "in pursuance of the [felony] and not collaterally to it." *State v. Pierce*, 23 S.W.3d 289, 294 (Tenn. 2001) (quoting *Farmer v. State*, 201 Tenn. 107, 115-116, 296 S.W.2d 879, 883 (1956)). The State need not show that Defendant intended to kill, only that he intended to commit the underlying felony. *Id.* -202(b). Aggravated child abuse is defined as the commission of child abuse when the "act of abuse results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). A person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* -401(a). "'Serious bodily injury' means bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. §39-11-106(a)(34). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]"*Id.* -106(a)(2).

The State may prove a material fact by either direct or circumstantial evidence. *Stinson v. State*, 181 Tenn. 172, 178, 180 S.W.2d 883, 885 (1944). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). The circumstantial evidence, however, must exclude every other reasonable theory or hypothesis other than guilt. *Tharpe*, 726 S.W.2d at 900. In addition, the circumstantial evidence "must establish such a certainty of guilt of the accused

as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." *Id.* (citations omitted).

Whether the victim's injuries were inflicted knowingly or accidentally is a question of fact for the jury. Intent is seldom proved by direct evidence and may therefore be deduced by the trier of fact from the nature and character of the offense and from all of the circumstances surrounding the offense. *See State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); *State v. Holland*, 860 S.W.3d 53, 59 (Tenn. Crim. App. 1993).

The medical evidence established that the victim died as a result of severe blunt force injuries to the head. These injuries included two occipital fractures, one parietal fracture, cerebral edema, subgaleal, subdural and subarachnoid hemorrhaging and retinal hemorrhaging in both eyes. Dr. Gerber testified that the presence of the three forms of cerebral bleeding as well as the retinal bleeding indicated a combination of rotational and translational injuries and concluded that the injuries were not accidentally inflicted. All four doctors testified that the severity of the victim's injuries were not consistent with Defendant's testimony that he accidentally dropped the child from a height of approximately six feet on to a carpeted surface. It was the jury's prerogative to reject Defendant's explanation of how the victim's injuries were incurred, or his suggestion that the victim's injuries were sustained or aggravated during medical treatment. The medical evidence was sufficient to support the jury's finding that the injuries were knowingly inflicted. Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support Defendant's convictions for first degree felony murder and aggravated child abuse.

## II. Autopsy Pictures

Defendant argues that the three photographs of the victim taken at the time of the autopsy which were introduced into evidence by the State were so prejudicial as to deprive Defendant of a fair trial. The State initially offered five photographs for admission that were taken during or after the victim's autopsy. Following a hearing out of the presence of the jury prior to Defendant's first trial, the trial court found that the photographs were relevant but ruled that the fifth photograph showing the exposed subgaleal hemorrhage in the victim's skull was inadmissible. The trial court found that the State could sufficiently illustrate the extent of the victim's cerebral hemorrhaging with the CAT scan taken at Vanderbilt Hospital.

Of the four photographs ruled admissible, the State introduced three into evidence during Defendant's second trial. The first photograph is a frontal view of the victim from the chest up that shows the contusions on the victim's forehead and the scrape next to his eye. The victim's eyes are partially open in this photograph. In the second photograph, the victim's upper lip is pulled back to show the lacerated frenulum. The third photograph was taken after the subgaleal hemorrhage was removed and shows the victim's revealed scalp at the area of the fractures. Only that portion of the scalp is visible, and all other parts of the victim's face and body are covered.

Defendant argues that the State's medical testimony sufficiently described the nature and extent of the victim's injuries. *See State v. Duncan*, 698 S.W.2d 63 (Tenn. 1985) (Photographs of victim's body was admissible to show position of clothing because the defendant denied that a sexual attack occurred, but photograph of knife wound was inadmissible in light of the medical testimony). As a result, Defendant submits that the trial court erred in ruling the autopsy photographs admissible, particularly the photograph of the victim's revealed scalp.

The admissibility of a photograph lies within the sound discretion of the trial court, and the trial court's ruling will not be overturned absent a showing of an abuse of discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). The photograph, however, must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Although it is the prejudicial aspect of the photographs which is the focus of Defendant's argument, we have reviewed the photographs and conclude that they were clearly relevant. Photographs of a victim's injuries are relevant if the defendant admits he killed the victim but attempts to show it was an accident. *Banks*, 564 S.W.2d at 949. Defendant strenuously contested the manner in which the victim died, arguing that the child's death was accidental and involved one single incident. The State may show through photographs, as it did in this case, "that greater force was used against the victim than is consistent with the defendant's account of the facts." *Id*. at 950. Furthermore, Defendant argued that the majority of the victim's injuries were subsequently inflicted by medical personnel, or at least aggravated, because the initial x-ray of the victim's skull showed only one fracture. The autopsy photograph of the victim's revealed scalp helped illustrate the medical testimony that the extent of the victim's injuries were not discoverable except through an autopsy.

Notwithstanding relevance, the probative value of the photographs must outweigh any unfair prejudicial effect that they may have on the trier of fact to withstand exclusion. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998). The prejudicial nature of a photograph of the victim rises to the level of unfairness if the photograph unduly suggests "a decision on an improper basis, commonly . . . an emotional one." *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998)(quoting *Banks*, 564 S.W.2d at 951). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." *Collins*, 986 S.W.2d at 20 (quoting M. Graham*, Handbook of Federal Evidence*, 182-83 (2d. ed. 1986)). In *Collins*, the State introduced photographs of the bruised and bloodied infant victim who was drowned minutes after birth. *Collins*, 986 S.W.2d at 21. The size of the victim or the fact that there had been a live birth were not contested, and the photographs were therefore not probative of a material issue. Even if marginally probative, a panel of this Court concluded that the prejudicial effect of the dead infant's photographs substantially outweighed any probative value of the evidence. *Id*.

In the case *sub judice*, however, the nature and extent of the victim's injuries were directly at issue. The State's proof that Defendant knowingly inflicted the injuries rested solely upon the medical testimony that the severity of the victim's injuries was inconsistent with an accidental fall. The photographs, while certainly unpleasant, were helpful in understanding the medical testimony of the State's witnesses. We are unable to conclude that the trial court abused its discretion in ruling

that the probative value of the photographs in question was not substantially outweighed by the risk of unfair prejudice.  Defendant is not entitled to relief on this issue.

## III.  Expert Testimony

The ultimate conclusion of Dr. Clayton's lengthy testimony was her opinion that the victim's injuries were not accidentally incurred.  During her testimony, Dr. Clayton also said that the victim died from the inflicted injuries.  Dr. Clayton based her opinions on her examination of the victim, the autopsy report, her personal experience gained through her pediatric practice and her participation on Vanderbilt's child abuse team, and her review of current medical literature.  Defendant argues in general that Dr. Clayton did not possess the necessary experience to qualify her as an expert on the manner and cause of the victim's death because she is not a forensic pathologist.  Alternatively, even if the trial court properly qualified Dr. Clayton as an expert in the field of pediatrics and child abuse, Defendant argues that Dr. Clayton's testimony was not admissible because she based her opinions on unreliable facts and data as prohibited in *McDaniel v. CSX Transport, Inc.*, 955 S.W.2d 257 (Tenn. 1997).

The qualification, admissibility, relevance, and competency of expert testimony is left to the broad discretion of the trial court.  *State v. Stevens*, 78 SW.3d 817, 832 (Tenn. 2002); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).  A witness who is qualified in a particular field may testify in the form of an opinion if the specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue.  Tenn. R. Evid. 702; *see McDaniel*, 955 S.W.2d at 264-65.  A trial court's ruling will not be overturned on appeal absent a clear abuse of discretion in admitting or excluding the expert testimony.  *Stevens*, 78 S.W.3d at 832.

Based upon our review of the record, we cannot conclude that the trial court abused its discretion in qualifying Dr. Clayton as an expert in the fields of pediatrics and child abuse.  Moreover, even though the trial court did not qualify Dr. Clayton as an expert in forensic pathology, as the victim's emergency treating physician, Dr. Clayton could testify as to her examination of the victim and the victim's cause of death.  *State v. Duncan*, 698 S.W.2d 63, 68 (Tenn. 1985).  The fact that Dr. Clayton is not a forensic pathologist goes to the weight of her testimony and not its admissibility.

Notwithstanding her qualifications, Defendant also argues that the trial court improperly admitted Dr. Clayton's testimony because her opinions were unreliable.  To determine the reliability of the facts and data underlying the expert testimony, a trial court may consider such factors as "(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation."  *McDaniel*, 955 S.W.2d at 265.  Defendant essentially argues that Dr. Clayton's opinions are unreliable because she has not published any research on the topic of child abuse injuries, and because Dr. Clayton based her opinion primarily on one article.  In addition, Defendant points out

that Dr. Clayton spent less than one hour examining the victim and twenty-four to twenty-nine hours conducting research in preparation for trial.

Dr. Clayton testified at trial that her opinions were consistent with medical literature that is generally accepted in the field of pediatrics. In support of her opinion that the victim's injuries were not accidental, Dr. Clayton referred to a report issued by the American Academy of Pediatrics' Committee on Child Abuse and Neglect which discussed, among other topics, rotational cranial injuries in children. Dr. Clayton explained that such reports are subject to extensive review prior to publication both by the Academy and through a peer review. Dr. Clayton conceded that the report was not issued until July, 2001, after Defendant's first trial. Dr. Clayton also testified that she spent considerable time prior to both of Defendant's trials reviewing current medical data concerning injuries similar to those incurred by the victim to insure that her testimony concerning head injuries in children was accurate and current.

Defendant's counsel ably and thoroughly cross-examined Dr. Clayton. Counsel questioned Dr. Clayton at length about a medical article that concluded that even short distance falls can result in a child's death. Dr. Clayton testified that she was familiar with the article but did not agree with the author's conclusions, and the opinions expressed in the article were not consistent with general medical practices. The jury was free to accept or reject Dr. Clayton's testimony.

We cannot conclude that Dr. Clayton's opinions in this matter were unreliable and therefore inadmissible. Defendant is not entitled to relief on this issue.

## IV. Rebuttal Testimony

Defendant testified that he dropped the victim accidently from his shoulder when he suffered a sudden painful muscle spasm in his back. At the conclusion of Defendant's testimony, the State called Dr. Bruce Levy, the Chief Medical Examiner for Davidson County, as a rebuttal witness, and defense counsel objected. Following a hearing out of the presence of the jury, the trial court allowed Dr. Levy to testify but specifically limited his testimony to the issue of whether, in his opinion, the victim's injuries were incurred in the manner described by Defendant during his direct examination. Dr. Levy based his testimony on Dr. Gerber's autopsy report, the physical slides prepared during the autopsy and the autopsy photographs. Based on his review, Dr. Levy testified that the victim's injuries were not consistent with a fall from approximately six feet on to a carpeted floor.

Defendant argues that the trial court erred in allowing Dr. Levy to testify as a rebuttal witness because the defense did not present any medical testimony as to the manner and cause of the victim's death. Defendant also submits that Dr. Levy's testimony was based on Dr. Gerber's autopsy report and thus merely cumulative. Finally, Defendant argues that the State's failure to give Defendant notice that Dr. Levy would be called as a rebuttal witness denied Defendant the opportunity to prepare for his testimony or secure his own expert witness.

Rebuttal testimony is testimony that explains or controverts the evidence produced by the adverse party. *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979). Rebuttal evidence includes "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence" introduced by an adverse party. *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979); *see also State v. Smith*, 735 S.W.2d 831, 835 (Tenn Crim. App. 1987). Like other evidence, rebuttal evidence must be relevant and material to the facts at issue. *State v. Lunati*, 665 S.W.2d 739, 747 (Tenn. Crim. App. 1983). The admission of rebuttal evidence lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of discretion. *State v. Kendricks*, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996); *State v. Braden*, 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993).

Although Dr. Levy's testimony was somewhat cumulative as Defendant argues, his testimony was based on his independent review of the information available at the time of the autopsy. Also, Dr. Levy's testimony was evidence which was a direct reply to and/or a contradiction of Defendant's testimony that the victim was accidently dropped from Defendant's shoulder. Based on the broad discretion granted the trial court in admitting rebuttal evidence, we cannot conclude that the trial court erred in allowing Dr. Levy's testimony to rebut Defendant's explanation during his testimony as to how the victim's injuries were inflicted.

The State's duty to disclose its witnesses is directory only. *State v. Dillenger*, 79 S.W.3d 458, 489 (Tenn. 2002). In general, a defendant's request to discover the names of the State's witnesses does not apply to rebuttal witnesses. *State v. Teal*, 793 S.W.2d 236, 246 (Tenn. 1990). Since Dr. Levy's testimony was proper rebuttal to an issue raised in Defendant's testimony, the State was not required to disclose Dr. Levy's name as a witness to Defendant in advance. *Id.* Defendant is not entitled to relief on this issue.

## V. Expert Witness' Refusal to Testify

At Defendant's first trial, the defense called Dr. Charles Harlan as an expert witness. Based on his review of the autopsy reports and photographs, and the reports from Vanderbilt Hospital, Dr. Harlan agreed that the cause of the victim's death was a blunt force trauma to the head, but testified that the manner of death could not be determined from the medical information. Dr. Harlan said that it was impossible to know whether the victim was injured by a fall or a blow. Contrary to the State's medical testimony, Dr. Harlan testified that the victim's skull fractures were caused by a single point of impact that resulted in fractures running in multiple directions from that central point. Dr. Harlan testified that he had performed autopsies on numerous infants with head injuries similar to the victim's and cited one incident where a nine-month-old baby suffered fatal head injuries when he was dropped from his father's arms.

On cross-examination, the State inquired about some of Dr. Harlan's autopsies involving children with similar head injuries, and Dr. Harlan initially declined to respond because of pending litigation. Dr. Harlan then voluntarily discussed an autopsy in which he had determined that the death of a child with similar injuries to the victim's was accidental. Dr. Harlan conceded that his

conclusions in that autopsy were being challenged by members of the medical profession, including Dr. Levy.

After Defendant's first trial, Dr. Harlan informed Defendant's counsel that he was unwilling to testify at the second trial because of the adverse publicity generated by his previous testimony. Defendant filed a motion for a continuance to allow him time to secure the services of another expert witness, and the trial court granted Defendant's motion. Defendant, however, did not present any expert testimony at his second trial.

Essentially, Defendant argues that he should be granted a new trial because the trial court at Defendant's first trial failed to control the scope of the State's cross-examination of Dr. Harlan in order to insure that Dr. Harlan was amenable to testifying at Defendant's second trial. Defendant does not cite any authority in support of this position, and the issue is thus waived. Tenn. R. Crim. A. 10(b); Tenn. R. App. P 27 (a)(7). Nonetheless, we note that Defendant's first trial ended in a mistrial without a judgment of conviction. Whether or not the trial court should have curtailed the State's cross-examination of Dr. Harlan at Defendant's first trial is not subject to review in this appeal. After the first trial, Defendant was afforded ample opportunity to procure the services of another expert witness but the record is silent as to what steps, if any, were taken in that regard. In any event, Defendant proceeded to trial without such a witness. Defendant is not entitled to relief on this issue.

## VI. Indictment

Defendant argues that the trial court erred by granting the State's oral motion to amend Count 3 of the indictment without the consent of Defendant. The original indictment as to Count 3 read as follows:

### COUNT 3

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

### ANDREW NEAL DAVIS

on the 28th day of January, 2000, in Davidson County, Tennessee and before the finding of this indictment, did knowingly, other than by accidental means, treat Caine Leigh McPeak (d.o.b. 5/9/99), a child under eighteen (18) years of age in such a manner as to inflict injury, and the act of abuse resulted in serious bodily injury to the child, in violation of Tennessee Code Annotated §39-15-402, and against the peace and dignity of the State of Tennessee.

On the first day of Defendant's second trial, the trial court brought to the State's attention the fact that the indictment reflected that the victim was under eighteen years old instead of under six

years of age.  The State orally moved to amend the indictment to state that the victim was less than six years of age, and the trial court granted the State's motion over Defendant's objections.

Defendant was charged with aggravated child abuse pursuant to Tennessee Code Annotated section 39-15-402 which addresses injuries to and neglect of children under the age of eighteen.  The culpability and punishment for the offense increases if the child is six-years-old or less.  Tenn. Code Ann. § 39-15-402(b).  Thus, the age of the victim is an essential element of the offense of aggravated child abuse.  *State v. Drucker*, 27 S.W.3d 889, 898 (Tenn. 2000).

To satisfy constitutional requirements, "an indictment must provide the accused with notice of the offense charged, provide the court with an adequate ground upon which a judgment may be entered, and provide the defendant with protection against double jeopardy."  *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001), citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). The facts contained within the indictment must be stated in ordinary language so that the accused may know what is intended.  Tenn. Code Ann. §4-13-202.  An indictment which fails to allege all of the elements of the charged offense in the terms of the statute will still be sufficient if the omitted elements are necessarily implied from the factual allegations.  *State v. Marshall*, 870 S.W.2d 532, 538 (Tenn. Crim. App. 1993), citing *Hagner v. United States*, 285 U.S. 427, 430, 52 S. Ct. 417, 419, 76 L. Ed. 861 (1932) *overruled on other grounds, State v. Carter*, 988 S.W.2d 145, 148-49 (Tenn. 1999).  Moreover, an indictment is sufficient if it contains a specific reference to the pertinent statute which is sufficient to place the accused on notice of the charged offense.  *State v. Sledge*, 15 S.W.3d 93, 94 (Tenn. 2000); *Carter*, 988 S.W.2d at 148.

The trial court has the discretion to grant or deny a motion to amend an indictment, and the trial court's ruling will not be overturned on appeal absent an abuse of discretion.  *State v. Kennedy*, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999).  Rule 7(b) of the Tennessee Rules of Criminal Procedure states that:

> An indictment, presentment or information may be amended in all cases with the consent of the defendant.  If no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the defendant's consent before jeopardy attaches.

The original indictment contained a specific reference to the statute defining the offense of aggravated child abuse.  The indictment, however, did not specifically allege whether the charged offense was a Class A felony or a Class B felony.  The indictment alleged that the offense occurred on January 28, 2000, and that the victim's date of birth was May 9, 1999.  Even assuming that the alleged date of the offense in the indictment is superfluous and not required to be specifically proven, the indictment alleged that the offense occurred before the return of the indictment on March 2, 2001.  The original version of the indictment essentially alleged that the victim was less than six years of age when the offense occurred, and the allegation in the indictment that the victim was less than eighteen years of age is not inconsistent. Changing that wording to less than six years of age did

not charge an additional or different offense, and none of Defendant's substantial rights were prejudiced. Tenn. R. Crim. P. 7(b). Defendant is not entitled to relief on this issue.

## VII. Cumulative Error

Defendant argues that he is entitled to a new trial because the cumulative effect of the errors in this case effectively deprived him of his right to a fair trial. Because we have found no substantial errors that would alter the outcome of the trial, this issue is without merit.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE