STATE of Tennessee, Petitioner,

v.

Lois THOMPSON, Respondent.

Supreme Court of Tennessee.

March 14, 1977.

Jack E. Seaman, Asst. Atty. Gen., Nashville, for petitioner; R. A. Ashley, Jr., Atty. Gen., Nashville, of counsel.

R. Bruce Ray, Jamestown, Roger E. Jenne, Elliott, Goode, Jenne & Varnell, Cleveland, for respondent.

## OPINION

HARBISON, Justice.

Respondent was indicted for violation of T.C.A. § 39–501, which provides as follows:

"Any person who willfully and maliciously sets fire to or burns, causes to be burned, or who aids, counsels or procures the burning of any house or outhouse, or any building, or any other structure, the property of himself or of another, shall be guilty of arson and shall be punished by confinement in the penitentiary for not less than three (3) years nor more than twenty-one (21) years."

The indictment charged that the respondent

"unlawfully, feloniously, willfully and maliciously did counsel and procure the burning of a building owned by Cletus Benton, known as Holiday Plaza and located in the State and County aforesaid, by a person or persons to the Grand Jurors unknown, who did feloniously, willfully and maliciously burn the same, contrary to TCA 39–501 and against the peace and dignity of the State."

▪ The trial jury found respondent guilty of "procuring arson" and the judgment upon the verdict used the same phraseology, although under the statute it is expressly provided that a person convicted "shall be guilty of arson" rather than "procuring" the same. In the statute rendering convicted persons infamous, the offense is again referred to as "arson" without reference to whether a defendant personally committed the act, or counseled or procured it. T.C.A. § 40–2712.

We regard the error in the verdict and judgment as immaterial, and the same should be corrected to show that the respondent was convicted of arson under the provisions of T.C.A. § 39–501. See Broestler v. State, 186 Tenn. 523, 526, 212 S.W.2d 366 (1948); Wade v. State, 174 Tenn. 248, 251, 124 S.W.2d 710 (1939).

▪ Despite the fact that the final judgment should have been a conviction of arson, the indictment charged the defendant with counseling or procuring the burning of the building, so that it was incumbent upon the State to establish that the accused did engage in such activity. The evidence offered by the State was largely circumstantial. At the conclusion of the State's proof in chief, counsel for respondent moved for a directed verdict pursuant to the provisions of T.C.A. § 40–2529. This motion was overruled, the trial judge finding that there was sufficient evidence to take the case to the jury.

Respondent did not stand upon her motion for a directed verdict and rest her case at that point. Although she did not take the stand, she offered four witnesses in her defense. While the testimony of these witnesses was generally favorable to the respondent, on cross-examination the State elicited from them some testimony favorable to and consistent with its theory.

At the conclusion of all of the evidence, the case was submitted to the jury without further reference to a directed verdict. Counsel for respondent did not renew the motion which had been made at the conclusion of the State's proof in chief. The jury found respondent guilty, and the trial judge overruled a post-trial motion filed in her behalf.

On appeal, the Court of Criminal Appeals held that the trial judge was in error in not sustaining the motion of the respondent made at the conclusion of the State's evidence in chief. The Court reversed the

judgment of the trial court and dismissed the charges for that reason.

In following this procedure, the Court of Criminal Appeals, in our opinion, was in error. Since the respondent did not rest her case at the end of the State's proof but offered evidence on her own behalf, her motion made at the conclusion of the State's proof was, in trial parlance, "waived". Thereafter any further consideration of a directed verdict would have to be based upon another motion embracing the entire record, and not just the State's proof in chief. It was, therefore, error for the Court of Criminal Appeals in effect to go back to the midpoint of the trial and order a directed verdict upon the basis of the record as it then stood.

The procedural device known as a motion for directed verdict developed in the common law of this State, largely in civil cases. The Tennessee case law was incorporated into Rule 50 of the Rules of Civil Procedure, with only a few technical changes. Essentially the State procedure on directed verdicts is similar to that which developed in the federal courts.[1]

An excellent discussion of the nature and use of the motion for directed verdict, particularly that made at the close of the plaintiff's evidence, is found in the opinion of Judge Felts in *Sadler v. Draper*, 46 Tenn. App. 1, 326 S.W.2d 148 (1959). In that case it is pointed out that the motion for directed verdict was a successor to the older demurrer to the evidence, which proved impracticable and unwieldy in modern trial procedure. Like the demurrer to the evidence, however, the motion for directed verdict:

" . . . is a common law device for separating law from fact, in order to test the legal sufficiency of the facts in evidence; and the rules governing the two procedures, while different, are analogous in many respects." 46 Tenn.App. at 11–12, 326 S.W.2d at 153.

As pointed out in that case, no party has an absolute right to have a directed verdict granted until the close of all of the evidence. If a motion made at the conclusion of the plaintiff's proof is overruled, the defendant must stand upon his motion, and rest his case without offering proof, in order to have the record at that point preserved for appellate review. If the motion is overruled and the defendant does not stand upon the motion, but rather proceeds to offer evidence, then it is necessary for the defendant to "renew" his motion—actually to make another motion—at the end of all of the evidence in order to have the same considered. Both the trial and appellate courts then review the entire record, not just the plaintiff's case in chief, in determining whether the defense motion should be granted.

Because of differing burdens of proof and other fundamental differences between civil and criminal trials, for many years in this state the appellate courts disapproved the use of the directed verdict procedure in criminal cases. *See* Caruthers, *History of a Lawsuit*, § 363 (8th ed., Gilreath, 1963). Frequently it was stated that if the trial court or the appellate court were dissatisfied with the verdict of the jury, proper procedure was to order a new trial. *See State v. Ferguson*, 165 Tenn. 61, 52 S.W.2d 140 (1932); *see also Stinson v. State*, 181 Tenn. 172, 180 S.W.2d 883 (1944); *Knowling v. State*, 176 Tenn. 56, 138 S.W.2d 416 (1940).

Admittedly there are problems inherent in criminal cases which prevent complete adaptation of civil procedure on directed verdicts into criminal trials. Most jurisdictions, however, have not found these to be insuperable, and some form of directed verdict procedure is now authorized in the criminal law of nearly all of the states as well as in the federal system. *See* A.B.A. Standards Relating to Trial by Jury, Standard 4.5 and comments thereto; 3 *Wharton's Criminal Procedure* § 520 (12th ed. Torcia, 1975); Winningham, "The Dilemma of the Directed Verdict", 15 Vand.L.Rev. 699 (1962); Rule 29, Federal Rules of Criminal Procedure.

1. *See* Rule 50, Federal Rules of Civil Procedure.

In Tennessee prior to 1968, there had been little development of practice or of case law regarding directed verdicts in criminal cases comparable to that which had occurred in civil procedure. In that year, however, the General Assembly enacted what is now T.C.A. § 40–2529, as follows:

"In a criminal prosecution the trial judge shall direct the jury to acquit the defendant if at the close of the evidence for the prosecution, or at the close of all the evidence, the court is of the opinion that the evidence is insufficient to warrant a conviction."

This statute has been construed in a number of decisions by the Court of Criminal Appeals. While the considerations surrounding a directed verdict are not identical in criminal cases to those in civil cases, nevertheless the same basic principles apply, and a generally similar "test" for directing verdicts in criminal cases to that used in civil trials has been approved by that Court. *See Jones v. State*, 533 S.W.2d 326, 329 (Tenn.Cr.App.1975); *Hill v. State*, 4 Tenn.Cr.App. 325, 470 S.W.2d 853 (1971); *Rambo v. State*, 4 Tenn.Cr.App. 466, 472 S.W.2d 911 (1971).

■ We approve the following rule which was stated in the cases cited above:

"The rule for determining a motion for a directed verdict requires the trial judge and the reviewing court on appeal to look at all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in its favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as ·to the conclusion to be drawn from the whole evidence, the motion must be denied." *Jones v. State*, 533 S.W.2d 326, 329 (Tenn.Cr.App.1975).

■ While again recognizing that there is not complete analogy between civil and criminal procedure, we are also of the opinion that under the present statute the practice used in civil cases should be used in criminal cases with respect to the times when a motion for directed verdict may appropriately be made on behalf of a defendant in a criminal trial. The trial judge should not be placed in error for overruling a motion at the conclusion of the State's proof when the defendant has not then rested his case, but has gone forward with evidence in his own behalf. The principle of waiver has been almost universally applied in such cases in other states. *See* A.B.A. Standards, *supra; State v. Smith*, 332 So.2d 773 (La.1976).

■ In the instant case if the State is given the strongest view of the evidence, together with all reasonable and legitimate inferences which could be drawn in its favor, and if the countervailing evidence of the respondent is discarded, then we do not consider that a directed verdict for the accused is appropriate. The action taken by the trial judge at the conclusion of the State's case is no longer available for review under the rules stated above. Had a motion been timely made at the conclusion of all the evidence, however, we are of the opinion that it would not have been proper for the trial judge to grant the same, and that he was correct in submitting the issues to the jury.

The proof, stated favorably to the State, reflects that the respondent had opened a business on leased premises in a newly constructed shopping center, in the Spring of 1974. This was a ladies' clothing store, in which the respondent apparently received substantial financial assistance from one Herman Beaty. He had countersigned at least two notes with her at different banks, and was referred to in the record as a close personal friend of the respondent and her husband.

There were no financial records offered at the trial to show whether this business was profitable or not. It is clear, however, that by the date of the fire, October 8, 1974, respondent was in rather severe financial difficulties. She was delinquent on several notes, sales taxes to the State, and rental

payments to her landlord. She had given a number of checks which had been returned for insufficient funds. While respondent undertook through witnesses to explain these matters, there was clearly evidence to support an inference that the respondent was in straitened financial circumstances during the weeks preceding the fire.

Several witnesses testified that the fire, which consumed respondent's shop and severely damaged some adjacent premises, began in the rear of the respondent's store, near a platform at a receiving door. One witness working in a nearby store heard a muffled explosion, and when he ran outside he saw flames coming from respondent's store. He said "there was more to the back" and that "it hadn't gone sideways, either way." This testimony, corroborated by other eyewitnesses, conflicted sharply with that of the respondent's expert who concluded that the fire originated somewhere other than the respondent's premises. At the least, a jury issue was presented as to whether the fire did or did not originate in the respondent's store.

On the day following the fire, a portion of carpet, covered with debris, was found near a back door of the respondent's store, soaked with gasoline. A piece of two-by-four plank, with which this door was secured on brackets, was found to be on the floor, rather than in place, charred only on top. One store employee, testifying for respondent, stated that this barrier was in place and secure just before the witness closed the store at about 9:30 p. m. on the night of October 8. She left in company with the respondent and some other persons, but one of these persons testified that after the group had reached the front door, the respondent left them, and went, alone, back into the store. This testimony was given by Mrs. Mullinax, who testified that the group had reached the front door and that the respondent was unable to find her key in order to lock it. She testified that respondent went back into her office, then returned stating that she had found her key.

We have no way of knowing how long respondent was thus alone or what she did. The record shows however, that within twenty minutes her building was in flames, and the next day there was evidence that the barrier on the rear door had been removed. Certainly some rather strong inferences favorable to the State and adverse to respondent suggest themselves.

While there is no eyewitness testimony that the respondent "counseled" or "procured" some other person to burn the building, there is testimony that immediately after the muffled explosion was heard and the fire was observed, an automobile was seen speeding away from the premises, going uphill and passing three or four other cars. There is also testimony that, whether she had "counseled" with him before the fire or not, Mrs. Thompson "counseled' with Mr. Beaty immediately after the fire, going to his house that same evening and discussing "insurance" with him. It is perhaps significant that respondent did not call Mr. Beaty as a witness.

A few days after the fire, there was discovered in a service station operated by Mr. Beaty a substantial amount of inventory which had been shipped to the respondent's store and which had been observed in the store by some of her employees. It had apparently been removed to Mr. Beaty's premises either on the morning of the fire or a very short time previously, and was discovered on a shelf in his filling station, concealed behind products which are normally used in the servicing of automobiles. There was testimony that respondent's store was crowded and lacked storage space; there was also testimony, however, that some of the items found in the station were needed for sales purposes. How and when respondent arranged for the merchandise to be placed in Mr. Beaty's station is unexplained. In all events, the arrangement was made shortly before the fire.

It is not beyond reason for a jury to conclude that Mrs. Thompson and Mr. Beaty were in collusion in connection with this fire, particularly in view of the indebtedness of the business and Mr. Beaty's obliga-

tions therefor. Certainly, as we have previously stated, the State is entitled to the strongest legitimate view of the evidence on this appeal, and we believe that reasonable minds could conclude that Mrs. Thompson had "counseled" with Mr. Beaty concerning this fire before it occurred, as well as after it, as charged in the indictment.

The foregoing is only a partial recitation of the evidence. There was testimony from which the jury could reasonably have concluded that Mrs. Thompson had recently increased the insurance on her stock of goods, and that she had attempted to over-insure, or at least highly insure, her accounts receivable. A substantial number of accounts receivable had been returned to her from a bank at which they had been factored, on the day of the fire, because the bank had found them uncollectible.

In view of the numerous suspicious circumstances surrounding this fire, we are firmly of the opinion that the Court of Appeals was in error in directing a verdict in this case, and its implicit conclusion that the verdict is contrary to the preponderance of the evidence also presents a very close issue.

The directing of a verdict, of course, is entirely different from reviewing the preponderance, particularly in criminal cases, where well-settled rules, too frequently cited to need discussion here, govern the role and function of an appellate court.

"It is a well-settled rule that this Court will not reverse a criminal case on the facts unless it is shown that the evidence preponderates against the verdict and in favor of the innocence of the accused.

"The verdict of the jury, approved by the Trial Judge, accredited the testimony of the witnesses for the State, and established their credibility. Such verdict also displaced the presumption of defendants' innocence, raised a presumption of their guilt, and put upon them here the burden of showing that the evidence preponderates against the verdict and in favor of their innocence." *White v. State*, 210 Tenn. 78, 84–85, 356 S.W.2d 411, 414 (1962).

It is certainly true that there is "countervailing" testimony in the record. An attempt was made by the respondent to explain all of the circumstances which we have above outlined. Inferences favorable to her can be drawn. The issues were extremely close, and there was evidence from which the jury could have found either guilt or innocence.

In this state, a trial judge has a unique function with respect to jury verdicts, in criminal cases as well as in civil cases. He is commonly referred to in the reported cases as a "thirteenth juror", and is required either to approve or disapprove the findings of the jury. If he fails to exercise this function, the case will be reversed and remanded for a new trial. See *Messer v. State*, 215 Tenn. 248, 385 S.W.2d 98 (1964).

Where, as in the present case, the trial judge has approved a jury verdict, an appellate court should be reluctant to overturn that verdict on the basis of a preponderance of the evidence. That it has the authority to do so, in criminal cases unlike jury verdicts in civil cases, however, is well settled, and this function is an entirely different one from that of directing a verdict of acquittal.

In this case there is conflicting testimony as to the origin of the fire—whether it started in respondent's premises at all, and if so whether it was incendiary in origin. Whether a case of arson was presented, and if so, whether respondent played any part therein by counseling or procuring it to be done were, in our opinion, issues for the jury, and we cannot conscientiously say that their verdict is contrary to the weight and the preponderance of the evidence, under rules governing appellate review of criminal trials.

The judgment of the Court of Criminal Appeals is reversed and the judgment of the trial court is reinstated at the cost of respondent.

COOPER, C. J., and FONES, HENRY and BROCK, JJ., concur.