# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE
## April 27, 2010 Session

## STATE OF TENNESSEE v. BRYAN KEITH GOOD

**Direct Appeal from the Circuit Court for Sullivan County**
**No. S51, 136      Jon K. Blackwood, Judge**

---

**No. E2009-00926-CCA-R3-CD - Filed September 23, 2010**

---

A Sullivan County jury convicted the defendant, Bryan Keith Good,[1] of attempted aggravated robbery, a Class C felony, criminally negligent homicide, a Class E felony, and unlawful possession of a deadly weapon, a Class E felony.  The trial court sentenced him as a Range III, persistent offender to fifteen years for the Class C felony and six years for each of the Class E felonies.  The court ordered the defendant to serve the sentences consecutively in the Tennessee Department of Correction, for an effective sentence of twenty-seven years.  On appeal, the defendant (1) challenges the sufficiency of the evidence to support his convictions for attempted aggravated robbery and unlawful possession of a deadly weapon; (2) argues that the trial court erred in denying his motion for judgment of acquittal; and (3) contends that the trial court erred in imposing consecutive sentences and in denying alternative sentencing.  Following our review, we conclude that the convictions for both attempted aggravated robbery and unlawful possession of a deadly weapon violate double jeopardy protections.  The defendant's convictions for attempted aggravated robbery and unlawful possession of a deadly weapon are hereby merged.  The defendant's remaining convictions and sentences are affirmed.  We remand solely for the entry of appropriate judgments consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded**

J.C. MCLIN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J. and JAMES CURWOOD WITT, JR. J., joined.

George Todd East, Kingsport, Tennessee, for the appellant, Bryan Keith Good.

---

[1] The record contains several alternate spellings of the defendant's name.  We will use the spelling contained in the indictment throughout this opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry Staubus and William Harper, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Background**

In January 2006, a Sullivan County grand jury indicted the defendant, Bryan Keith Good, on five counts: one count of murder in the perpetration of a felony, two counts of aggravated assault, one count of attempted aggravated robbery, and one count of unlawfully carrying or possessing a weapon. Prior to trial, the state dismissed the aggravated assault charges. The matter proceeded to trial on July 7, 2008, and the parties presented the following evidence.

Detective Randy Simpson, of the Sullivan County Sheriff's Office, testified that he investigated the death of Michael Brandon Mottern. On August 13, 2005, Detective Simpson received a dispatch at 4:39 a.m. to go to 932 Allison Road, Piney Flats, Tennessee. He arrived at 5:00 a.m. and located the victim's body in a five-acre field of tall grass, approximately 150 feet from the road. Detective Simpson testified that the field was adjacent to a brick house. The victim had a close-range shotgun wound to his chest and had a closed pocket knife in his hand. Detective Simpson located a crowbar approximately ten feet from the victim. Based on his interviews with persons at the scene, he learned that Anthony Branche and Laura Carrier rented the brick house adjacent to the field and had left the scene prior to law enforcement arriving. He also learned that witnesses saw two white males leaving the scene in a maroon and gold Dodge Dakota truck. When he located the truck, he verified through the license plate number and registration that the defendant owned the truck. When Detective Simpson searched the brick house, he did not find money or drugs, but he did find a shell from a .9 millimeter pistol. He also found footprints in the detached garage but was unable to collect the prints due to the condition of the floor. Detective Simpson found shotgun wadding on Allison Road approximately one to one and a half miles from the house, in the direction that witnesses said the Dodge truck proceeded when it left the scene.

Concurrently with the investigation into the victim's death, Detective Simpson investigated an incident at Joshua Branche's apartment at the Graystone Apartments in Gray, Washington County, Tennessee. He learned that witnesses saw a white Mazda pickup truck belonging to Greg Nutter leaving Mr. Branche's apartment. Detective Simpson located Mr. Nutter at his residence on August 13. He obtained a statement from Mr. Nutter and collected Mr. Nutter's clothing and eyeglasses to submit for gunshot residue testing. He also collected a camcorder from Mr. Nutter's residence. Related to the camcorder, Detective Simpson collected from the defendant a check written by Elaine Nutter, Mr. Nutter's grandmother, to

the defendant for the purchase of the camcorder. In the course of the investigation, Detective Simpson interviewed Peggy Ramey and her boyfriend, Mike Compton, at Ms. Ramey's residence in Gray, Tennessee. He collected a .12 gauge shotgun, .12 gauge shells, and one spent .12 gauge shell from Ms. Ramey's residence. Detective Simpson testified that Ms. Ramey knew the defendant. Detective Simpson also interviewed Roberta Corder, a waitress at the Sit-N-Bull restaurant in Gray, Tennessee, who knew the defendant. He obtained a video surveillance tape of the restaurant from August 13 that showed the defendant, who matched the description that witnesses gave of the perpetrator. Sheriff deputies located the defendant in Kingsport, and Detective Simpson took him into custody and seized his truck. The defendant did not have any injuries. Detective Simpson testified that the truck had mud and grass on its undercarriage. He sent portions of the interior of the truck to the Tennessee Bureau of Investigation ("TBI") crime laboratory to test for the presence of blood. He also sent Mr. Nutter's and the defendant's clothes to the TBI to test for blood and gunshot residue. All of the tests were negative for the presence of blood and gunshot residue.

Constance Bower testified that in July and August of 2005 she was dating Joshua Branche. Approximately one month before the victim died, they were in their vehicle about to leave the Graystone Apartments when the defendant "came out of nowhere and was beating on the window asking Joshua where [Anthony Branche] was." The defendant said that he was looking for Anthony Branche because he would not answer his phone. Joshua Branche did not tell the defendant where Anthony Branche was but said that he rarely spoke with his brother. Ms. Bower testified that the incident lasted approximately ten to fifteen minutes, at which point they left.

Chris Stine, a police officer with the Johnson City Police Department, testified that he lived on Allison Road in Piney Flats. He was traveling home on August 12, 2005, at approximately 11:30 p.m. when he saw a white pickup truck parked under a tree in a field. The truck was facing Allison Road. Officer Stine considered it out of place, and when he heard about the victim's murder, he notified the Sheriff's Office about the truck.

Laura Carrier testified[2] that she lived at 932 Allison Road with Anthony Branche, her boyfriend. On August 12, 2005, she and Mr. Branche returned home from going out to eat at approximately 10:30 p.m. They were watching television when their dog, Scarface, began barking and going down to the basement. Ms. Carrier thought his behavior was strange, so she asked Mr. Branche to look outside. Mr. Branche turned on the front porch light, and then they closed and locked the front and back doors. Ms. Carrier said that all of the lights inside and outside of the home were on. At 4:00 a.m. on August 13, Mr. Branche looked out of the

---

[2] Ms. Carrier was deceased at the time of trial. The state read her preliminary hearing testimony at trial, as redacted by the trial court in response to the defendant's trial counsel's objections to hearsay.

front door. Ms. Carrier testified that she did not hear any vehicles, and she did not see anything outside because she did not look out. After looking outside, Mr. Branche called his brother, Joshua Branche, and Ms. Carrier called her cousin, Heather Murray. She said that she called Ms. Murray because she was scared. They both stayed in the house until Joshua Branche arrived. The dog continued to act strangely by going from door to door "like he could sense something around . . . ." When Joshua Branche arrived, Ms. Carrier said that she heard the victim's car as he drove up the driveway. She did not know the victim and did not know that he was coming with Joshua Branche. Anthony Branche left with his brother, and she stayed in the house until Ms. Murray arrived. She left with Ms. Murray and went to the Branches' mother's house. She returned home after the police arrived.

On cross-examination, Ms. Carrier testified that she had lived with Anthony Branche for two and a half years. She said that there were no guns in the house. Ms. Carrier said that when Anthony Branche left the house, he was not armed. She did not hear any gunshots or other unusual noises. When she left the house with Ms. Murray, they passed the victim's Acura Integra. She did not see a truck or any other vehicle.

Joshua Branche testified that he knew the defendant because they met in jail. He said that they had been friends in the past. Mr. Branche testified that he lived on Old Gray Station Road in Washington County, Tennessee, in August of 2005. On August 12, he saw two people trying to break into his apartment. He followed them to get their vehicle's tag number. He returned home and called the police. Because the door was broken, he decided to go to the victim's house. He said the vehicle was a white 1990s model Ford or Mazda pickup truck. Joshua Branche was at the victim's house when Anthony Branche called him and seemed scared. At approximately 4:00 a.m., he and the victim drove to his brother's house on Allison Road in Piney Flats, Tennessee, in the victim's Acura Integra.

Joshua Branche further testified that when they approached his brother's house, he saw people at the side door. The victim pulled into the driveway and pulled the emergency brake. The victim jumped out of the car and chased the people behind the house. Mr. Branche ran to the door, yelling for his brother. Mr. Branche testified that he did not recognize the people and that they were wearing either black or camouflaged clothing. When he heard a truck start, he got into the driver's seat of the victim's car, and his brother got into the passenger's seat. He saw the truck drive out of the field behind his brother's house. They began to follow the truck in order to get the tag number, but because Joshua Branche recognized the truck as belonging to the defendant, he did not write down the number. As they followed the truck, he "heard loud noises and [saw] flames coming from the truck[,]" so he turned around and went back to his brother's house. When they returned to the house, he asked his brother and Ms. Carrier where the victim was. They did not realize that anyone had been with him when he arrived. They took flashlights and began to search for the victim.

After approximately five minutes, Joshua Branche found the victim lying on his back in the field. He did not get close enough to see whether the victim had any injuries but immediately called 9-1-1. Mr. Branche testified that his brother left the field, but he did not know where his brother went. He waited near the road for law enforcement to arrive. Mr. Branche testified that neither he nor the victim were armed when they left the victim's house. He neither knew the victim to normally carry a weapon, nor did he see any weapons in the victim's car. Mr. Branche testified that the defendant came to his apartment one to two weeks prior to the victim's death, asking him where his brother was. Mr. Branche said that his brother used illegal drugs, which was why he did not speak with him often.

On cross-examination, Mr. Branche testified that he did not know whether Anthony Branche sold drugs, but he did not work and always had money. He said that Anthony Branche owned a dog named Scarface who had bitten him in the face, leaving a large scar.

Greg Jeffery Nutter testified that he had entered an agreement with the state to plead guilty to facilitation of first degree murder and receive an eighteen-year sentence, conditioned upon his truthful testimony at the defendant's trial. He testified that he had known the defendant since he was sixteen years old but that after high school, he did not have much contact with him until 2005. In 2005, co-workers informed him that he could purchase marijuana from the defendant at a lower price than he was currently paying. He gave his phone number to co-workers to give to the defendant. Mr. Nutter said that he purchased marijuana from the defendant two or three times prior to August 12, 2005.

Mr. Nutter testified that on August 12, 2005, he picked up his paycheck at 2:00 p.m. and then called the defendant to purchase marijuana from him. He met the defendant at Randy Compton's house and purchased the marijuana as planned. They went together to an auto parts store to buy parts for the defendant's Ford F-150. Mr. Nutter explained that the defendant had two trucks: the Ford and a red Dodge Dakota. On the way to the auto parts store, they smoked marijuana, and the defendant gave Mr. Nutter some Xanax pills. They discussed a camcorder that the defendant had for sale. They returned to Mr. Compton's home and smoked more marijuana. Then, Mr. Nutter went home.

Later that evening, Mr. Nutter called the defendant about purchasing the camcorder. The defendant gave him directions to Peggy Ramey's home on Liberty Church Road in Gray, Tennessee, and Mr. Nutter went there to see the camcorder. Mr. Nutter and the defendant agreed that Mr. Nutter would pay the defendant $50 the next day. He would pay the rest when he received his next paycheck, and they also discussed exchanging a Kawasaki motorcycle. Mr. Nutter took the camcorder, and then he and the defendant got into Mr. Nutter's truck to ride around and smoke marijuana. As Mr. Nutter drove, the defendant directed him to an apartment complex on Old Gray Station Road. Mr. Nutter later learned

that they were going to Joshua Branche's apartment. The defendant told him that Mr. Branche owed him money. The defendant knocked on Mr. Branche's front door and "touched" the back door, which would not open. The defendant got back into Mr. Nutter's truck, and they began driving around. The defendant eventually directed Mr. Nutter to drive to Anthony Branche's house on Allison Road and explained to him that the Branche brothers "owed him money[,] and he was going to get it." Sometime between 11:00 p.m. and 12:00 a.m., Mr. Nutter backed his truck into the field adjacent to Anthony Branche's house. The defendant told him that they were either going to get money or drugs from Anthony Branche and warned him that there was a "vicious dog." Mr. Nutter took a small crowbar with him when they approached the house. They heard the dog bark, and a light came on, so they went back to Mr. Nutter's truck. From there, they returned to Joshua Branche's apartment. The defendant used a tire tool to open the apartment door, and they went inside the apartment. Mr. Nutter testified that the apartment was empty and that they did not take anything. As they were driving out of the apartment parking lot, a white Prelude pulled into the parking lot and began to chase them. The defendant told him that he recognized the vehicle and knew it to be very fast. They eventually lost the Prelude and went to Ms. Ramey's house.

At Ms. Ramey's house, the defendant told Mr. Nutter to get into the red Dodge Dakota because it was faster than Mr. Nutter's Mazda. The defendant went inside the house and returned with a pump action shotgun. The defendant said "[t]hat he had hand loaded that bad boy." They drove back to Allison Road and parked in the field beside Anthony Branche's house. The defendant instructed Mr. Nutter "to cover the dog" and repeated that they would either get drugs or money. When they left the truck, the defendant took the shotgun and gave Mr. Nutter a small loaded pistol. Mr. Nutter said that the pistol was possibly a .32 caliber. Mr. Nutter also carried the crowbar. At that point, Mr. Nutter wore a hood with an exposed face, and the defendant wore a mesh hunting mask. They went to a corner of the house, and the defendant looked inside. He told Mr. Nutter that the residents were "shooting up dope" and "would be asleep soon." Mr. Nutter testified that the defendant suddenly became startled, and they "fled into the . . . garage." In the garage, they switched head coverings, so that Mr. Nutter had the mesh mask and the defendant had the hood. The defendant told him that they were going to have to kick in the door of the house, but they would not have to worry about the residents because they were high. The dog would be their only concern. They walked around the house, and the defendant went onto the porch. At that point, they saw headlights and ran through the field towards the truck. Mr. Nutter testified that he heard footsteps behind them, and a young man said either "'I'll cut you, mother-f***er' or 'I'll gut you, mother-f***er.'" Mr. Nutter looked over his shoulder and saw the defendant turn and fire the shotgun. Mr. Nutter said that he dropped the crowbar at some point between hearing the man speak and the defendant firing the shotgun. He said that he was running too fast to tell how close the defendant was to the young man. Mr. Nutter said that he had never seen the victim before.

Mr. Nutter testified that they got into the defendant's truck and drove away. A vehicle was chasing them, and someone in the vehicle was shooting at them. Mr. Nutter said that the defendant told him he should shoot back. Mr. Nutter took the shotgun and tried to fire it out of the window. He said that the empty shell had not been cleared, so he ejected the shell and reloaded. He testified that he did not know where the empty shell went. He fired the shotgun at the vehicle behind them. The vehicle stopped following them, and they returned to Ms. Ramey's house. The defendant told him that he might have "peppered" the man in the field and gave him a story to tell anyone who asked where they had been. The defendant said that they should tell people they were "coon hunting." Mr. Nutter left Ms. Ramey's house in his truck and went home.

Mr. Nutter testified that the defendant came to his house the next morning, along with a co-worker of Mr. Nutter. The defendant mentioned that they had been hunting the previous night. Mr. Nutter gave the defendant a check from his grandmother for $50, and the defendant looked at Mr. Nutter's motorcycle. The next Monday, the police interviewed Mr. Nutter. He testified that he gave the police three statements. He lied in the first statement, told the partial truth in the second statement, and told the full truth in the third statement.

Roberta Corder testified that she was a waitress at the Sit-N-Bull restaurant in Gray, Tennessee, in August 2005. She said that she knew the defendant because he dated her daughter. Ms. Corder testified that the defendant came into the restaurant on August 13, 2005, early in the morning. She recalled that he was wearing denim overalls, which were wet on the bottom. She said that he told her that he had been helping someone with their cattle. Ms. Corder identified the restaurant surveillance tape from August 13, 2005, which she had given to law enforcement. The state played the tape for the jury.

Peggy Ramey testified that she was a friend of the defendant. In August 2005, the defendant came to her house almost daily for two weeks prior to the victim's death. Ms. Ramey said that she lived with her boyfriend, Mike Compton, and her grandson. On August 12, the defendant brought Greg Nutter to her house to show him a camcorder. He came to her house again after midnight. Ms. Ramey said they talked in her living room until she went to sleep. The next morning, between 8:00 a.m. and 8:30 a.m., he was asleep on her recliner, wearing the same overalls he had been wearing the day before. Ms. Ramey testified that she normally kept a shotgun in the spare bedroom closet and kept the shells in a shelf in her bedroom closet. On Sunday, August 14, 2005, she noticed that the shotgun was in a corner of her bedroom and a bag of shells was on her bed. She also found a spent shell on the kitchen table. Investigators spoke with her the following day, and she gave them the shotgun and shells.

Mike Compton testified that he lived with Ms. Ramey on Liberty Church Road in Gray, Tennessee. He recalled seeing the defendant and Greg Nutter at their house on August 12, 2005. Mr. Compton said that Mr. Nutter was looking at a camcorder that he was interested in buying. He had never seen Mr. Nutter before, but he had known the defendant for several years. Mr. Compton testified that he kept a shotgun in their computer room, and he did not move the gun at any point on August 12. He kept the shells in the closet in the bedroom. Mr. Compton said that he did not see the defendant again on August 12, but he saw the defendant sleeping in the recliner on the morning of August 13.

TBI Agent Steve Scott, of the firearms identification unit, testified that the shotgun from Ms. Ramey's residence fired the spent shotgun shell found at her residence. He further testified that the shotgun wadding submitted by Detective Simpson was consistent with the shotgun shells found at Ms. Ramey's residence. He explained that the wadding was from the same manufacturer and was the same gauge, construction, and color.

Dr. Teresa Allen Campbell, a forensic pathologist, testified that she performed an autopsy on the victim on August 18, 2005. She testified that the victim died from a loose contact shotgun wound to the chest, meaning that the muzzle of the gun was against his skin when the gun discharged.

TBI Agent Elizabeth Reed testified that she did not find latent prints on the shotgun or the crowbar. She testified that she found two latent prints on the camcorder, one that she identified as Greg Nutter's and one that remained unidentified. She developed a latent palm print from a shotgun shell, but the print did not match Mr. Nutter, the defendant, or Ms. Ramey.

*Defense Proof.* Amy Nutter, Greg Nutter's wife, testified that her husband did not work on August 12, 2005, but he picked up his paycheck that day. They went shopping and cashed his check. Mr. Nutter went to Randy Compton's house and returned home. Mrs. Nutter testified that he had been smoking marijuana but was not impaired. She said that the defendant was not with him. Mr. Nutter left home again and did not return until early Saturday morning. At that point, he was more impaired than he had been on Friday evening. Mrs. Nutter testified that law enforcement came to their house at some point, but she could not recall the exact day. The officers told her they were looking at Mr. Nutter's truck. When the state charged her husband with murder, she did not ask him what happened because she did not want to be involved.

Gary Daugherty testified that Mr. Nutter told him, while they were both in the custody of the state, that he shot a man in self-defense because that man was trying to cut him.

-8-

On cross-examination, Mr. Daugherty testified that the conversation with Mr. Nutter took place on July 31, 2005.

On re-direct examination, Mr. Daugherty said that the conversation took place six weeks after the victim died.

Andrew Atkins testified that Mr. Nutter told him that the defendant "would take the fall for this shooting . . . ." He said that the conversation took place in the Washington County Detention Center. Mr. Atkins testified that he was a friend of the defendant's younger brother and that he knew Mr. Nutter because they were previously neighbors.

On cross-examination, Mr. Atkins testified that the conversation with Mr. Nutter occurred between May and July of 2005.

On re-direct examination, Mr. Atkins said that the conversation occurred between May and September of 2005. He said that he knew Anthony and Josh Branche and that they had a reputation as drug dealers who always armed themselves.

The defendant testified that he met Greg Nutter in high school. The defendant explained that they became reacquainted in 2005 when the defendant saw Mr. Nutter pulling onto Old Gray Station Road. The defendant got Mr. Nutter's attention, and they both pulled into a parking lot and exchanged phone numbers. The defendant said that they smoked marijuana together occasionally. He said that he purchased marijuana from the Branche brothers but never carried more than a couple of joints.

The defendant testified that on August 12, 2005, Mr. Nutter met him at Randy Compton's house, and they went together to buy parts for the defendant's truck. Mr. Nutter asked him to find him Xanax pills, and the defendant told him that he would ask Peggy Ramey. Mr. Nutter went home, and the defendant went to Ms. Ramey's house and purchased Xanax pills from her. He also retrieved approximately $70 worth of marijuana from a freezer to sell to Mr. Nutter. The defendant explained that he had purchased the marijuana from Joshua Branche. The defendant took the marijuana and Xanax pills to Mr. Nutter's house, but Mr. Nutter did not have enough money to pay for everything. He promised to pay him the remainder the following Friday. The defendant said that Amy Nutter was present during the exchange. While the defendant was at the Nutters' house, Joshua Branche called him to ask whether he knew anyone he could sell marijuana to and to tell him that someone had broken into his apartment and stolen marijuana. The defendant and Mr. Nutter talked about the Branche brothers after Joshua Branche called because Mr. Nutter knew Anthony Branche. The defendant testified that he mentioned the camcorder that he had for sale to Mrs. Nutter, and she told him that she would like to see it. The defendant and Mr. Nutter

went to Ms. Ramey's house to get the camcorder. They returned to Mr. Nutter's house, and Mr. Nutter went to his grandmother's house. He came back with a $50 check, and they arranged for the defendant to also take Mr. Nutter's motorcycle in exchange for the camcorder.

The defendant testified that Mr. Nutter asked him four or five times to take him to Joshua Branche's apartment. The defendant said that Mr. Nutter discussed with his wife the possibility of getting marijuana from Mr. Branche and selling it. They drove to Mr. Branche's apartment in Mr. Nutter's Mazda. The defendant showed him which apartment it was, and then they went back to Mr. Nutter's house. The defendant told him that he was going to go to Ms. Ramey's house because he did not want to be involved in stealing marijuana from Mr. Branche. He went to Ms. Ramey's house, and Mike Compton was the only other person there. The defendant said that Mr. Nutter came over approximately thirty minutes after he arrived and told him that Mr. Branche's apartment was empty. Mr. Nutter asked him to take him to Anthony Branche's house. They went to Allison Road in Mr. Nutter's Mazda. Mr. Nutter parked in a field, and they got out of the truck. Mr. Nutter took a crowbar with him. They walked around the house until they heard the dog barking, and then they ran back to the truck. Mr. Nutter told the defendant that he dropped his crowbar when they were running back. While driving back to Ms. Ramey's, the defendant explained to Mr. Nutter about Anthony Branche's dog, Scarface. Before they went to Ms. Ramey's, Mr. Nutter wanted to show him that Joshua Branche's apartment was empty, so they drove to Mr. Branche's apartment. Mr. Nutter showed him an empty apartment, but the defendant told him that he had gotten the apartment number wrong. Mr. Nutter then walked to the correct apartment and tried to open the door with a tire tool. A car pulled into the parking lot, so they returned to Mr. Nutter's truck. When they drove away, the car followed them at first, but eventually, the car turned in a different direction. Mr. Nutter asked the defendant to borrow a gun to protect himself from Scarface when he went back to Anthony Branche's house. The defendant retrieved a .9 millimeter pistol that he had hidden in a tool box at a friend's house, but Mr. Nutter did not want to carry the pistol because the pistol was in poor condition. They went to Ms. Ramey's house and asked to borrow a gun. Initially, Ms. Ramey refused, but the defendant assured her no one would get hurt because the gun was merely protection against the dog. Mr. Compton loaded the shotgun and gave it to Mr. Nutter.

The defendant testified that they drove out to Anthony Branche's house for the second time in his truck rather than Mr. Nutter's. They walked across the field to the house, and Mr. Nutter pushed on the kitchen door, which would not open. They both went onto the front porch, and Mr. Nutter looked inside the window. They went around to the back of the house, and they saw Mr. Branche leave the residence in his car. The defendant told Mr. Nutter that Ms. Carrier would still be inside. They waited several minutes, and Mr. Branche returned.

-10-

They walked around the house again, and the dog began barking. The defendant testified that he was carrying the .9 millimeter pistol in his overalls, and Mr. Nutter was carrying the shotgun at that point. They heard a car coming, and they went back to the truck. The defendant said he was in the treeline by the time the car pulled into the driveway, but Mr. Nutter was hiding in bushes near the house. They both began running when the car pulled into the driveway. The defendant testified that he heard gunshots fired at them, and then he heard a loud gunshot behind him. The defendant testified that "[he] figured [Mr. Nutter was] shooting back at these guys . . . [that were] shooting at [them]." They got into the truck, and Mr. Nutter said that he thought he shot someone. When they drove away, a car followed them. The defendant testified that the occupants of the car began shooting at them. Mr. Nutter said "something about shooting them," and the defendant told him that he should shoot back. Mr. Nutter had to eject a shell from the gun before he could shoot, and the defendant said that Mr. Nutter put the ejected shell in his pocket. Mr. Nutter fired back at the car following them. They drove to Ms. Ramey's house. The defendant returned the shotgun to Ms. Ramey and left. Mr. Nutter left in his Mazda. The defendant returned his pistol to his friend's tool box and went to his girlfriend's house, and then to the Sit-N-Bull Restaurant. After eating breakfast, he went to Ms. Ramey's and fell asleep. The defendant testified that he did not go to Mr. Nutter's house that day. On Sunday, Mr. Nutter called him and asked him whether he had seen the news. The defendant told him that he had not seen the news, and Mr. Nutter asked him whether he remembered when they went coon hunting the other night. The defendant said that he thought Mr. Nutter was using code words. The defendant left his house to go to Mr. Nutter's house to talk about what happened and a Sullivan County sheriff's deputy pulled him over. The defendant said that at that point, he still did not know that someone had been shot and did not learn about the victim's death until he watched the news the following night. The defendant denied that he attempted to rob Anthony Branche and denied that he shot the victim.

Following the close of proof and deliberations, the jury convicted the defendant of attempted aggravated robbery, a Class C felony, criminally negligent homicide, a Class E felony, and unlawful possession of a deadly weapon, a Class E felony. The trial court sentenced him as a Range III, persistent offender to fifteen years for the Class C felony and six years for each of the Class E felonies. The court ordered the defendant to serve the sentences consecutively in the Tennessee Department of Correction, for an effective sentence of twenty-seven years.

**Analysis**

The defendant's appellate brief initially presents nine issues for our review.[3] However, for the sake of judicial efficiency, we will combine all of the defendant's issues that involve the sufficiency of the evidence to support his convictions. Additionally, we will review the defendant's issue regarding his motion for new trial together with his sufficiency arguments. Therefore, we summarize the defendant's arguments as follows: (1) the trial court erred in denying the defendant's motion for a judgment of acquittal; (2) the evidence

---

[3] The defendant lists these issues for our review:

1. Whether the evidence contained in the record is insufficient to support a finding of guilty beyond a reasonable doubt by a rational trier of fact that [the defendant] committed the offense of attempted aggravated robbery of Anthony Branche and the jury verdict is therefore contrary to the weight of the evidence?

2. Whether the evidence contained in the record is insufficient to support a finding of guilty beyond a reasonable doubt by a rational trier of fact that [the defendant] committed the offense of unlawful possession of a deadly weapon in an attempt to employ it in the commission of or escape from an offense and the jury verdict is therefore contrary to the weight of the evidence?

3. Whether the evidence contained in the record is insufficient to support a finding by a rational trier of fact that [the defendant] is guilty beyond a reasonable doubt of the convictions of attempted aggravated robbery and unlawful possession of a weapon, and the jury verdict is therefore contrary to the weight of the evidence?

4. Whether the jury verdict was contrary to the law and the evidence?

5. Whether the evidence preponderates in favor of [the defendant's] innocence and against a verdict of guilty?

6. Whether the trial court committed reversible error by not granting the [m]otion for directed verdict of acquittal at the close of the [s]tate's proof and/or at any other time the [m]otion was made?

7. Whether the trial court committed reversible error by denying [the defendant's] Motion for New Trial grounded, among other things, upon the lack of proof concerning the elements of intentional or knowing theft or property from the person of another by violence or putting the person in fear, or of a crime for which unlawful possession of a deadly weapon is applicable?

8. Whether the trial court committed reversible error in sentencing by imposing consecutive sentences, and further, by not properly balancing all mitigation and enhancement factors by failing to observe that any applicable enhancement factor was offset by mitigation factors?

9. Whether the trial court committed reversible error in sentencing by denying probation or alternative sentencing?

-12-

was insufficient to support the defendant's convictions for attempted aggravated robbery and unlawful possession of a deadly weapon; and (3) the trial court erred in sentencing the defendant.

## I. Motion for Judgment of Acquittal

Regarding the defendant's contention that the trial court erred in denying his motion for judgment of acquittal at the close of the state's proof, the state responds, under the authority of *Finch v. State*, 226 S.W.3d 307, 313 (Tenn. 2007), that the defendant presented proof in his defense at trial and thereby waived his motion for acquittal at the conclusion of the state's proof. "[A] defendant waives his or her right to appeal from a trial court's refusal to grant a motion for judgment of acquittal if the defendant continues to participate in the trial after the close of the [s]tate's proof." *Finch*, 226 S.W.3d at 316 (citing *Mathis v. State*, 590 S.W.2d 449, 453 (Tenn. 1979). To preserve the issue for appellate review at the point he made the motion, "the defendant must stand upon his motion, and rest his case without offering proof." *State v. Thompson* 549 S.W.2d 943, 945 (Tenn. 1977). If the defendant offers evidence and does not stand upon his motion, then the defendant must renew the motion at the end of all of the proof to have the issue considered on appeal. *See State v. Thompson*, 549 S.W.2d 943, 945 (Tenn. 1977). If the defendant renews the motion, the trial and appellate courts will determine whether the motion should be granted based on a review of the entire record. *See id.*

At the close of the state's proof, the defendant made a motion for judgment of acquittal, which the trial court denied. After the trial court's denial, the defendant continued to participate in the trial by calling witnesses and testifying. The defendant did not stand on his motion for judgment of acquittal nor did he renew his motion at the close of all the proof. Therefore, we conclude that the defendant has waived this issue with regard to the denial of his motion for judgment of acquittal at the close of the state's proof.

## II. Sufficiency of the Evidence

The defendant argues that the state failed to prove that the defendant "intended to use a deadly weapon to induce fear into Anthony Branche for the purpose of robbing his person." Additionally, he argues that his conviction for unlawful possession of a deadly weapon (1) violates the constitutional protection against double jeopardy when the underlying felony is attempted aggravated robbery and (2) is untenable if criminally negligent homicide is the underlying felony because "[i]t is not a rational interpretation of the two statutory crimes or the evidence to find one possessed a deadly weapon with the intention of committing a criminally negligent crime." The defendant does not challenge his conviction for criminally negligent homicide.

## A. Standard of Review

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

## B. Attempted Aggravated Robbery

In order to sustain the defendant's conviction for criminal attempt to commit aggravated robbery, the state had to prove that the defendant intentionally or knowingly acted with intent to complete a course of action or cause a result that would constitute aggravated robbery, under the circumstances surrounding the conduct as the defendant believed them to be, and the conduct constituted a substantial step toward the commission of aggravated robbery. *See* Tenn. Code Ann. §§ 39-12-101; 39-13-401; 39-13-402. As relevant to this case, aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," accomplished with a deadly weapon. *See id*.

Viewing the evidence in the light most favorable to the state, the proof at trial showed that the defendant and Mr. Nutter went to Anthony Branche's house, armed with a shotgun and a pistol, with the intent to steal Mr. Branche's money or drugs. They went so far as to approach the house and look inside before Joshua Branche and the victim arrived, foiling the defendant and Mr. Nutter's plan. Based on that evidence, we conclude that a rational jury

could have found that the defendant took a substantial step toward committing aggravated robbery. Therefore, the evidence was sufficient to support the defendant's conviction for attempted aggravated robbery.

### C. Unlawful Possession of a Deadly Weapon

The defendant contends that his conviction for unlawful possession of a deadly weapon with intent to employ it in the commission of or escape from an offense violates the constitutional protection against double jeopardy. We agree.

To determine whether the defendant's convictions violate double jeopardy, this court must apply the test announced in *United States v. Blockburger*, 284 U.S. 299 (1932); *State v. Black*, 524 S.W.2d 913 (Tenn. 1975). Under *Blockburger*, the test to determine if the two offenses are distinct is whether each offense requires proof of a fact that the other does not. *Blockburger*, 284 U.S. at 304. Tennessee Code Annotated section 39-17-1307(c)(1) (West 2005) provides that "[a] person commits an offense who possesses any deadly weapon with intent to employ it in the commission of or escape from an offense." The offense of attempted aggravated robbery, as indicted in this matter, requires that a person attempt to commit a robbery by use of a deadly weapon. *See* Tenn. Code Ann. §§ 39-12-101; 39-13-401; 39-13-402. This court has previously held that convictions for aggravated robbery and unlawful possession of a weapon were not distinct offenses for purposes of double jeopardy because "it [was] clear that proof of both elements of the weapons offense [did] not require proof of any element different from those included in the offense of aggravated robbery where a weapon is used." *State v. Elton Bowers*, No. 02C01-9308-CR-00180, 1994 WL 553368, at *6 (Tenn. Crim. App., at Jackson, Oct. 12, 1994); *see also State v. Jerry Bell*, No. W2005-02812-CCA-R3-CD, 2006 WL 2872472, at *4 (Tenn. Crim. App., at Jackson, Oct. 9, 2006). Likewise, we conclude that the proof for the defendant's conviction for unlawful possession of a deadly weapon did not require any proof beyond that necessary to establish the elements of attempted aggravated robbery. Therefore, the finding of guilty of attempted aggravated robbery and unlawful possession of a deadly weapon are hereby merged, and only a judgment of conviction for attempted aggravated robbery should be entered.

Because the indictment in this case did not indicate what offense the defendant intended to commit with a deadly weapon, we feel constrained to address his third conviction, criminally negligent homicide. The defendant argues that a person cannot logically be guilty of unlawful possession of a deadly weapon with the intent to employ it in the commission of criminally negligent homicide, because a negligent crime, by definition, is unintentional. We agree. This court has previously reasoned that attempted criminally negligent homicide is not a cognizable crime in Tennessee because criminal attempt requires an offender to have the specific intent to commit a crime while a charge of criminally

negligent homicide signifies that the offender acted without awareness. *See State v. Darryl Ammons*, No. M2004-01956-CCA-R3-CD, 2005 WL 1378775, at \*4 (Tenn. Crim. App., at Nashville, June 9, 2005). Likewise, unlawful possession of a deadly weapon, as charged in this case, requires specific intent to commit an offense, but the defendant, as proven by his conviction for criminally negligent homicide, acted without awareness. Therefore, we cannot sustain the defendant's conviction for unlawful possession of a deadly weapon with intent to employ in the commission of or escape from an offense, when the offense in question is criminally negligent homicide.

## III. Sentencing

The defendant argues that the trial court erred in (1) balancing the enhancement and mitigation factors; and (2) denying probation and/or alternative sentencing; and (3) imposing consecutive sentences. Because we have dismissed the defendant's conviction for unlawful possession of a deadly weapon, we limit our review of the defendant's sentencing to his sentences for attempted aggravated robbery and criminally negligent homicide.

In this case, the jury convicted the defendant of one Class C felony and two Class E felonies. The trial court found that the defendant was a Range III, persistent offender based on the defendant's record, which included at least five felonies within the conviction class or in within the next two lower felony classes. The defendant was, therefore, subject to a sentence of ten to fifteen years for attempted aggravated robbery, a Class C felony, and four to six years for criminally negligent homicide, a Class E felony. The trial court found that the following enhancement factors applied: (1) the defendant had a history of criminal convictions other than those necessary to establish the range; (2) the defendant had a conviction as a juvenile that, if adjudicated as an adult, would have been a felony; and (3) the defendant had a history of unwillingness to comply with a sentence involving release into the community. Furthermore, the trial court found that no mitigating factors applied. The court sentenced the defendant to fifteen years for attempted aggravated robbery and six years for criminally negligent homicide. The trial court ordered that the defendant serve his sentences consecutively after finding that the defendant had an extensive criminal record.

### A. Standard of Review

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors

and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

## *B. Balancing Enhancement and Mitigation Factors*

The defendant argues that his sentence is excessive because the trial court improperly balanced enhancement and mitigation factors. He contends that a sentence at the minimum of the range - four years for the Class E felony and ten years for the Class C felony - would be more appropriate.

Pursuant to the 2005 revisions to the sentencing statutes,[4] a trial court has broad discretion in determining the length of a defendant's sentence as long as the sentence imposed is within the applicable range of punishment and the trial court follows the sentencing act. *Carter*, 254 S.W.3d at 345. In order to facilitate appellate review, the trial court must set forth on the record which enhancement and mitigation factors it considered and the reasons for the sentence. *See id.* at 343. The 2005 revisions "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *Id.* at 344. A defendant may appeal based on grounds that the sentence is excessive under the sentencing considerations set out in Tennessee Code Annotated sections 40-35-103 and 40-35-210 or that the sentence is inconsistent with the purposes of the sentencing act set forth in sections 40-35-102 and -103. *Id.*; Tenn. Code Ann. § 40-35-210(b)(2). This court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346. The presumption that the trial court's determinations are correct fails if the record does not support the trial court's findings, if the trial court applied inappropriate enhancement or mitigation factors, or if the trial court did not follow the sentencing act. *Id.* at 344-45.

In this case, the trial court found three enhancement factors and no mitigation factors. The defendant argues that the trial court failed to properly balance the factors. However, he has failed to show that the trial court did not follow statutory sentencing procedures or guidelines. The trial court heard evidence regarding enhancement and mitigation factors and placed its findings on the record. The record does not preponderate against the trial court's findings. Therefore, we conclude that the defendant's argument is without merit.

## *C. Probation and/or Alternative Sentencing*

---

[4] The effective date of the 2005 amendments to the sentencing act was June 7, 2005. The offenses in this case occurred in August 2005.

The defendant argues that the trial court erred by not considering probation and/or alternative sentencing. The state responds that the defendant was not eligible for alternative sentencing and was not a favorable candidate for probation.

Tennessee Code Annotated section 40-35-102(6) provides that especially mitigated and standard offenders convicted of Class C, D, and E felonies are favorable candidates for alternative sentencing. A defendant is eligible for probation if the sentence imposed is ten years or less. *Id.* at 40-35-303(a). In this case, the trial court determined that the defendant was a Range III persistent offender and sentenced him to fifteen years for the Class C felony and six years for the Class E felony. The defendant, therefore, is not eligible for probation for the Class C felony due to the length of his sentence, but he is eligible for probation for the Class E felony. The defendant's offender status renders him an unfavorable candidate for alternative sentencing. Because the defendant's sentence for the Class C felony renders him ineligible for probation, the trial court was not bound to consider probation for that sentence. However, the trial court did not consider probation for the Class E felony; therefore, we review the defendant's sentence for the Class E felony *de novo*.

The sentencing act provides several factors for trial courts to consider when determining whether to suspend a defendant's sentence. Tennessee Code Annotated section 40-35-102(5) provides that

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

Additionally, section 40-35-103 provides that courts should consider the following when imposing sentences involving confinement:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Tenn. Code Ann. § 40-35-103. The defendant bears the burden of demonstrating that he is suitable for probation. *Id.* § 40-35-303(b).

In our review of the facts and circumstances of this case, we conclude that the defendant has not carried his burden of establishing suitability for probation. The record reveals that the defendant has an extensive criminal history, beginning as a juvenile, and that he has unsuccessfully received probation in the past.[5] Therefore, based on the defendant's prior record, he should not be granted probation in this case.

### B. Consecutive Sentences

The defendant argues that this court should reverse the trial court's imposition of consecutive sentences. Specifically, he argues that "consecutive sentences should be understood as being excessive" because the trial court sentenced the defendant to the maximum sentence for each conviction as a persistent offender.

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of following statutory criteria apply:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
>
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation

---

[5] The defendant's presentence report indicates that the Washington County Criminal Court placed him under supervised probation in 1998 following convictions for burglary and auto burglary. The court revoked his probation on February 8, 2000, but reinstated probation on November 16, 2000. Authorities arrested the defendant for violation of probation on January 11, 2001, based upon technical violations and for incurring new charges. The court revoked his probation on May 4, 2001.

about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

In this case, the trial court found that the defendant had an extensive criminal record. The record reveals that the defendant has more than five Class E felonies and thirteen to sixteen misdemeanors. We conclude that the record does not preponderate against the trial court's finding, and the defendant has not shown that the trial court abused its discretion. Therefore, the defendant is not entitled to relief for this issue.

**Conclusion**

Based on the foregoing reasons, we conclude that the jury's finding of guilty of attempted aggravated robbery and unlawful possession of a deadly weapon should be merged and that only a judgment of conviction for attempted aggravated robbery should be entered. We affirm the defendant's convictions and sentences for attempted aggravated robbery and criminally negligent homicide. We remand this case solely for entry of appropriate judgments consistent with this opinion.

_____

J.C. McLIN, JUDGE

-20-